James L. GAGAN, Plaintiff–Appellee,

v.

AMERICAN CABLEVISION, INC., Allwave Cable Construction Co., Inc., James A. Monroe, Hans D. Theurer, Charles M. Trimble, James Gouyd, and Victor E. Sharar, Defendants–Appellants.

Nos. 94–3970, 94–3982.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 27, 1995.

Decided Feb. 27, 1996.

Rehearing Denied April 1, 1996.

C. Joseph Yast (argued), Northfield, IL, for James L. Gagan.

Kenneth D. Reed (argued), Abrahamson, Reed & Adley, Hammond, IN, for Hans D. Theurer.

George J. Glendening (argued), Hammond, IN, E. Day Carman, E. Day Carman & Associates, Newport Beach, CA, for American Cablevision, Incorporated, James A. Monroe, Charles M. Trimble, James Gouyd, Victor E. Sharar, Allwave Cable Construction Company, Incorporated.

Before FLAUM, ROVNER, and EVANS, Circuit Judges.

TERENCE T. EVANS, Circuit Judge.

The recent advent of direct satellite television, with its seemingly limitless access to hundreds of different channels, makes it somewhat hard to believe that just a short time ago most Americans only had access to the three major television networks and PBS. However, as cable television (CATV) grew from its infancy in 1949 in rural America (where broadcast signals were too faint to receive) to most urban areas in the late 1970's and early 1980's, so did the variety and number of television channels, thereby changing forever the television-watching options for American viewers. The ensuing race to wire the country with cable television spurred numerous CATV business ventures. This case arises from one such undertaking; the investment by the plaintiff, James L. Gagan, in a cable television limited partnership, known as South Hesperia, in 1982. In 1987, after Gagan's investment turned sour, he filed a complaint against 14 individuals, corporations, and limited partnerships alleging claims under the federal Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–1968, and other claims under state law.

When the case was filed it was assigned to Chief Judge Allen Sharp of the United States District Court for the Northern District of Indiana. Judge Sharp ordered bifurcation of the RICO claims from the state law claims, and a trial began in September 1990. At the conclusion of the plaintiff's evidence, Judge Sharp directed a verdict in the defendants' favor on the substantive RICO claims under § 1962(b) and § 1962(c). The remaining RICO conspiracy claim under § 1962(d) was submitted to a jury, which deliberated but could not reach a verdict. A mistrial was declared, and the case was transferred, with the consent of the parties, to Magistrate Judge Andrew P. Rodovich for a second trial.

Prior to the start of the second trial in 1994, Judge Rodovich issued an order defining the scope of Judge Sharp's prior ruling on the RICO claims. Judge Rodovich would not allow relitigation of the substantive RICO claims (§§ 1962(b) and (c)), and he ordered that the § 1962(d) conspiracy claim be limited to a charge that the defendants violated RICO when South Hesperia's assets were sold. The judge also ordered that all other claims, including Gagan's state law claims and the defendants' counterclaims, be tried at the same time to the new jury. Finally, he settled a state choice of law issue, ordering that Indiana law apply to the fraud claim and that the law of Arizona govern the contract claim.

After a two-week trial, the jury returned a verdict in favor of Gagan on the RICO claim and most of the state law claims. The jury also shut the defendants out on their counterclaims. This appeal followed.

Losers in a trial can go hunting for relief on appeal with a rifle or a shotgun. The rifle is better. As we have noted, the shotgun approach may hit the target with something but it runs the risk of obscuring significant issues by dilution. *United States v. Levy,* 741 F.2d 915, 924 (7th Cir.), *cert. denied,* 469 U.S. 1021, 105 S.Ct. 440, 83 L.Ed.2d 366 (1984). The defendants here, apparently not impressed with our statement in *Levy,* have brought their shotgun to Chicago.

In the hope of finding error, either by the judge or the jury, the defendants raise many arguments, several of which are either undeveloped or waived. First, they assert that Gagan lacked RICO standing and, generally, that the evidence is insufficient to support the RICO finding. They allege insufficiency of evidence to support the state law claims and resulting inconsistencies in the verdict. They contend the district court erred in granting Gagan's motion in limine which sought to exclude certain evidence. They assert further error by the court in denying their summary judgment motion, and they

challenge the verdict against them on their counterclaim. Finally, defendant Hans D. Theurer, who proceeded at trial *pro se,* challenges the verdict against him on the breach of fiduciary duty claim and the court's refusal to grant him leave to plead the affirmative defense of discharge in bankruptcy.

The resolution of these issues requires a rather lengthy review of the facts which we review in the light most favorable to Gagan, who prevailed at the trial of this case. We start with the South Hesperia limited partnership, which we divide into three phases: organizational, operational, and sale. The "organizational" phase began in 1981 when defendant Victor Sharar was contacted by Paul Skulsky. Skulsky proposed setting up a bunch of tax-sheltered limited partnerships to fund, build, and operate cable television systems in Hesperia, an unincorporated area of San Bernardino County, California. Skulsky gave Sharar $225,000 in "seed money" to get the venture moving. In exchange, Skulsky was given a 25% share of profits to be realized. An associate of Skulsky's, Marc Pozner,[1] instructed Sharar to set up about a dozen Nevada corporations, including Security Cable Consulting Company, Inc. and defendant Allwave Cable Construction Company, Inc. Skulsky contacted defendant James Monroe, Sharar's son-in-law, and got him involved in the CATV limited partnerships. Monroe became the general partner of South Hesperia.

Meanwhile, investors were solicited for the South Hesperia CATV limited partnerships. Ultimately, 20 limited partnership units were sold, including 3 to Gagan. The purchase of each unit required $40,000 in cash and short-term notes, and an $85,000 long-term note payable to South Hesperia on December 31, 1992. Gagan's investment for three units consisted of $120,000 in cash paid in three installments over two years, plus execution of a $255,000 long-term note. The total investment from all unit holders in South Hesperia was $2,500,000—$800,000 in cash and short-term notes and $1,700,000 in noninterest-

---

**1.** Skulsky and Pozner were involved in other similar cable ventures beginning in 1977. In 1984 they were indicted in federal court in New Jersey on a bevy of charges: mail fraud, racketeering, conspiracy to defraud the Internal Revenue Service, and tax evasion. Their convictions on many of the charges were affirmed in 1986. *United States v. Skulsky,* 786 F.2d 558 (3d Cir. 1986).

bearing, long-term notes. One of the investors dropped out early in 1982, reducing the number of limited partnerships to 18. Gagan's three units gave him a 16.6% ownership interest in South Hesperia.

The second or operational phase of the venture related to the actual construction and operation of South Hesperia. It covered the period from late 1981 to June of 1986. In 1981, South Hesperia signed a construction contract with Allwave for $1,800,000 ($100,000 cash and $1,700,000 in long-term notes) to construct South Hesperia as a turnkey operation. Despite the contract price, the actual cost to build South Hesperia was no more than $600,000. Allwave, a shell company lacking the equipment and resources to construct a CATV system, subcontracted all construction work to defendant American Cablevision, Inc. (ACI) for cost plus $340,000 (20% of the $1,700,000 in long-term notes). ACI was a related entity owned entirely by Sharar, Charles Trimble, and James Gouyd. Like its affiliate Allwave, ACI lacked the resources to build the CATV system and so it subcontracted the work out. On December 15, 1991, Monroe appointed ACI as the managing agent for South Hesperia.

Starting in 1982, Monroe, the general partner, periodically informed the limited partners, including Gagan, of South Hesperia's ongoing activities. He sent them a series of reports describing the success of the partnership. Despite these favorable reports, the $1,700,000 contract with Allwave, coupled with interest on that amount, left no cash flow for the limited partners.

From the inception of South Hesperia in 1981, and with Monroe's knowledge and consent, Pozner directly controlled the operations, and particularly all financial operations, of South Hesperia, Allwave, Security Cable, and the other Hesperia limited partnerships[2] and construction companies. Skulsky was in on the deal with Pozner, and together they controlled all facets relating to the limited partnerships, including the issu-

ance of directives to Sharar to sign construction contracts with all of the Hesperia limited partnerships and assignment of those contracts to ACI. In September 1984, Skulsky and Pozner told Sharar that the Hesperia cable operation was in shambles. They asked Sharar to help salvage it. Pozner withdrew from further participation in the Hesperia partnerships at this time, citing personal reasons. Sharar's initial efforts to salvage the Hesperia operation included the November 15, 1984, hiring of Theurer as a financial consultant. Theurer came to represent not only the Hesperia entities, but also Allwave, ACI, and Sharar, Trimble, and Gouyd personally.

The third and last phase of South Hesperia, the period from 1985 to 1988, relates to the sale of the partnership assets and the distribution of the sale proceeds. The decision to sell South Hesperia came as early as May 1985 when the defendants agreed that they would sell the entire Hesperia cable system, and that Sharar, Trimble, and Gouyd would keep the proceeds. Theurer sent out a number of feelers in 1985, and the defendants seriously considered a number of proposals. In October of 1985, the defendants began negotiating a sale of all the Hesperia CATV limited partnerships, including South Hesperia, to Falcon Cable Systems.

Minot Tripp, an attorney, was hired to represent the seller-parties with respect to the Falcon sale. Not only did Tripp represent ACI, the managing agent for the six Hesperia partnerships in the Falcon sale, he also represented Sharar, Trimble, and Gouyd with regard to their purchases of the limited partners' interests. Sometime prior to January 29, 1986, Sharar had asked Tripp to advise him on the tax ramifications of selling the Hesperia system and acquiring the limited partners' interests. Tripp prepared a memorandum dated January 29, 1986, in which he advised Sharar to buy the limited partners' interests first and then sell the system.

2. Between 1982 and 1984, Pozner set up three similar limited partnerships, East Hesperia, Southeast Hesperia, and ICC Fifth Associates a/k/a Hesperia Red, to build other sections of the Hesperia cable system. This was done with the active participation of Sharar, Trimble, and Gouyd, through construction companies like Allwave and ACI.

Although the partnership agreement required the prior written consent of all the limited partners before sale of the limited partnership's assets, Tripp expressed the opinion that Monroe, in his capacity as the South Hesperia general partner, could sell the assets without obtaining consent. Tripp advised Sharar, Trimble, and Gouyd that a distribution of the proceeds from the Falcon sale would be best accomplished by a program whereby they acquired all of the limited partners' long-term promissory notes. The plan called for a buy-out offer to the limited partners consisting of cash and cancellation of the long-term notes. Tripp said this offer would minimize tax consequences for both the principals and limited partners.

Theurer proceeded next to draft a plan to carry out the Tripp recommendations. On April 26, 1986, Theurer circulated to Sharar, Trimble, and Gouyd a step-by-step plan for acquiring the ownership interests of the Hesperia limited partners, cautioning that "[n]either this letter, nor the enclosed analysis formally exist." One key part of the plan was that Sharar, Trimble, and Gouyd would purchase the partners' long-term notes from Allwave at ten cents on the dollar. On April 25, 1986, Theurer sent Monroe ten categories of financial material: the first three gave unfavorable financial results for South Hesperia; the last seven dealt with the sale of the system, the tax consequences to the limited partners, and the proposed buy-out by Sharar, Trimble, and Gouyd. On April 30, 1986, Theurer had already drafted the buy-out letter to send to the limited partners following the Falcon sale. Theurer told Monroe on May 12, 1986, to send the limited partners only the first three categories of materials he had sent him.

On June 30, 1986, Theurer gave Tripp the written buy-out offers, which were then mailed to all Hesperia limited partners, including Gagan. The cover letters, which referred to the financial information sent the month before, noted that "the Partnership's performance ... has fallen far short of projections." The letters enclosed an offer of cash in an amount approximating that tax liability plus forgiveness of the limited partner's long-term note. The buy-out proposals were accepted by all Hesperia limited partners except Gagan, who refused to go along with the program.

Meanwhile, the sale of the assets of all the Hesperia partnerships, including South Hesperia, closed on July 1, 1986, for a price of $6,680,000. Upon closing the sale, Falcon wired $3,400,000 into a bank account, denominated "Hesperia Escrow Account." The real purpose of the account, which was established and controlled by ACI, was to receive the proceeds of the Falcon sale and make them available to Sharar, Trimble, and Gouyd for acquiring the limited partners' interests in South Hesperia. The remaining $3,280,000 balance was paid by Falcon in installments in 1988 and 1989.

Significantly, the July 2, 1986, mailings to the Hesperia limited partners failed to disclose a number of significant matters. For example, it was not disclosed that the proposed purchasers were related parties, that the construction companies had never intended to collect the long-term notes in the first place, and that the cash portion of the consideration being offered to the limited partners for the purchase of their interests was actually the limited partners' own money realized on the sale to Falcon which had been deposited into ACI's account.

Over a year after the sale of partnership assets, Sharar, Trimble, and Gouyd purported to acquire the $1,530,000 of the limited partners' long-term notes from Allwave for ten cents on the dollar. Following the sale, the defendants made numerous interstate phone calls and over 40 mailings of Falcon proceeds in interstate commerce to various Hesperia limited partners in connection with acquiring their partnership interests.

At the trial, Gagan offered evidence that he sustained close to $750,000 in damages as a result of what he alleged to be unlawful conduct by the various defendants. Specifically, he alleged that he sustained $352,713 in damages as a result of the erroneous allocation of the Falcon sales proceeds; $128,877 in damages as a result of the excessive disbursements paid by South Hesperia to related "insider" parties; and $264,710 in damages as a result of excessive construction costs and interest paid by South Hesperia.

On the question of damages, the jury awarded Gagan $562,500, which the trial court trebled pursuant to 18 U.S.C. § 1964(c) of RICO, for a total compensatory damages award of $1,687,500. The jury also awarded Gagan $150,000 in punitive damages against four of the defendants.

The federal RICO statute, enacted over 25 years ago, was originally designed to fight organized crime. *Statement of Findings and Purpose,* Organized Crime Control Act of 1970, Pub.L. 91–452, 84 Stat. 922–23 (1970). In the last decade, however, RICO has become an increasingly controversial tool in general civil litigation because of its seemingly unlimited applicability.[3] The Act prohibits various forms of infiltration of legitimate business "enterprises" involved in interstate commerce through a "pattern of racketeering activity." 18 U.S.C. § 1962. Subsections (a), (b), and (c) of § 1962 set out substantive violations; § 1962(d) makes it unlawful "for any person to conspire to violate any of the provisions of subsection (a), (b), or (c)." Section 1964 of the Act authorizes civil suits arising out of § 1962 violations.

▪ The defendants contend first that Gagan is not permitted to recover on his RICO claim because he lacks standing. Whether standing was raised below is immaterial since "[s]tanding represents a jurisdictional requirement which remains open to review at all stages of the litigation." *National Organization for Women, Inc. v. Scheidler,* —— U.S. ——, ——, 114 S.Ct. 798, 802, 127 L.Ed.2d 99 (1994). Section 1964(c) permits "[a]ny person injured in his business or property by reason of a violation of section 1962" to bring a civil action under RICO.

The circumstances under which a private plaintiff has standing to sue under RICO have been debated and resolved in conflicting ways. The major disagreement centers on whether a claimant can allege injury by any overt act intended to further the enterprise, or whether the claimant must allege injury from a predicate act of racketeering. A predicate act must be one of the specifically

identified acts of racketeering listed in 18 U.S.C. § 1961. An overt act can be a predicate act, or any other act in furtherance of the conspiracy to violate RICO, so it encompasses a broader range of activities giving rise to standing. The First, Second, Eighth, and Ninth Circuits construe § 1962(d) narrowly, requiring a plaintiff to allege injury directly caused by a predicate act. *Miranda v. Ponce Fed. Bank,* 948 F.2d 41 (1st Cir. 1991); *Hecht v. Commerce Clearing House, Inc.,* 897 F.2d 21 (2d Cir.1990); *Bowman v. Western Auto Supply,* 985 F.2d 383 (8th Cir.), *cert. denied,* 508 U.S. 957, 113 S.Ct. 2459, 124 L.Ed.2d 674 (1993); *Reddy v. Litton Indus., Inc.,* 912 F.2d 291 (9th Cir.1990), *cert. denied,* 502 U.S. 921, 112 S.Ct. 332, 116 L.Ed.2d 272 (1991). This circuit and the Third Circuit interpret RICO more broadly, requiring that a plaintiff only allege an overt act that furthers a RICO conspiracy, even if the overt act is not a predicate act. *Schiffels v. Kemper Financial Services, Inc.,* 978 F.2d 344 (7th Cir.1992); *Shearin' v. E.F. Hutton Group, Inc.,* 885 F.2d 1162 (3d Cir.1989).

Although this circuit split has existed for some time, the Supreme Court has denied certiorari to decide the issue of standing for a § 1962(d) violation. *Bowman,* 508 U.S. 957, 113 S.Ct. 2459, 124 L.Ed.2d 674 (1993). It has ruled, however, on other standing issues under RICO. In *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985), the Court decided an issue of standing under § 1962(c) but did not impose a general standing limitation on § 1962(d). In *Holmes v. Securities Investor Protection Corp.,* 503 U.S. 258, 266–67, 112 S.Ct. 1311, 1317, 117 L.Ed.2d 532 (1992), the Court held that a plaintiff must establish that the defendant, by violating RICO, proximately caused the plaintiff's injuries. *Holmes* somewhat limited the scope of standing under *Sedima* by requiring proximate cause, but it did not provide a comprehensive guide for resolving standing issues generally.

▪ Whether Gagan has standing to recover under RICO is controlled by our deci-

---

**3.** *See, e.g.,* Chief Justice William H. Rehnquist, *Get RICO Cases Out of My Courtroom,* Wall St. J., May 19, 1989, at A14 ("I think that the time has arrived for Congress to enact amendments to civil RICO to limit its scope to the sort of wrongs that are connected to organized crime, or have some other reason for being in federal court.").

sion in *Schiffels*, in which we held that to establish standing to sue for a violation of § 1962, a plaintiff must allege that the defendant's overt act in furtherance of the RICO conspiracy injured the plaintiff's business or property. *Schiffels*, 978 F.2d at 351. We noted, however, that the overt act need not be one of the predicate acts of racketeering under § 1961, and it wasn't in Schiffels' case. Schiffels was a stock options trading assistant for Kemper Financial Services who alleged that her supervisor and several other Kemper officials conducted a fraudulent stock options trading operation and subsequently conspired to cover up the scheme when she discovered it. *Id.* at 346. Schiffels reported the scheme to her superiors, resulting in her dismissal, which she claimed was a further cover-up. She then sued, claiming that her retaliatory discharge violated RICO.

We held in *Schiffels* that injury from the discharge gave the plaintiff standing to sue under RICO. We refused to place "a limitation on RICO standing that RICO itself does not impose." *Id.* at 346. Since § 1962(d) does not require that a predicate act actually be committed, it follows that the act causing claimant's injury does not need to be a predicate act of racketeering. We explained that a "person directly injured by an overt act in furtherance of a RICO conspiracy has been injured by reason of the conspiracy," and thus should have standing to sue. *Id.* at 349. Interpreting § 1962(d) in this manner is consistent with common law concepts of conspiracy. *Id.* at 348. As Judge Flaum noted in *United States v. Neapolitan*, 791 F.2d 489, 497 (7th Cir.1986), "a conspiracy to violate RICO should not require anything beyond that required for a conspiracy to violate any other federal crime."

■ In this case, Gagan is qualified to sue and recover under RICO. Gagan pleaded, and the jury found, that the defendants conspired to violate RICO in their sale of South Hesperia's assets and the diversion of the sale proceeds. Gagan alleged, and the jury found, that his business and property interests in the limited partnership were injured by overt acts committed in furtherance of a RICO conspiracy.

■ Defendants do not seriously take issue with Gagan's allegation that the overt acts injured him in his business and property. Instead, they contend that only South Hesperia—the limited partnership itself—has standing to bring suit. Rather than cite authority on point for this proposition, the defendants offer cases involving RICO claims brought by shareholders against corporations. In those cases, the corporate shareholders did not have standing to bring RICO claims for racketeering activities conducted against the corporation because those claims are in reality derivative of the corporation's claims. Where the shareholder's injury resulted directly from an injury to the corporation, but only indirectly from the harm the wrongdoer wreaked upon the corporation, the RICO claim belongs to the corporation, and not the shareholder. *See Sears v. Likens*, 912 F.2d 889, 892 (7th Cir.1990); *Flynn v. Merrick*, 881 F.2d 446, 449 (7th Cir.1989); *Rylewicz v. Beaton Services, Ltd.*, 888 F.2d 1175, 1178–79 (7th Cir.1989) (RICO suits by individual shareholders to recover for injuries to the corporation are impermissible). The policy behind these cases is to prevent individuals from securing a double recovery—one directly as an individual and another indirectly as a shareholder of the corporation. The defendants concede that South Hesperia is not a corporation, but by analogy to the corporate setting, they argue, limited partners, such as Gagan, should not be permitted to bring individual RICO claims.

There is some authority which prohibits limited partners from bringing a suit for damages against the partnership as long as the partnership exists and has not been dissolved or liquidated. *See Whalen v. Carter*, 954 F.2d 1087, 1093 (5th Cir.1992) (under Louisiana law, the partnership itself is usually the proper party for maintaining an action seeking damages to the partnership); *Attick v. Valeria Assocs. L.P.*, 835 F.Supp. 103, 110–11 (S.D.N.Y.1992) (limited partner does not have standing to assert RICO claims if the only injury suffered was diminution of value of his investment in the limited partnership). In *Whalen*, the Fifth Circuit applied an exception to the general prohibition against individuals bringing suits against the partnership under Louisiana state law.

When the injury to the partnership is caused by the partner, the limited partner plaintiffs have RICO standing to sue not only the partners who defrauded the partnership, but also the nonpartner parties with whom the other partners conspired. *Whalen*, 954 F.2d at 1093.

This case involves a limited partnership, not a corporation, and the cases dealing with RICO claims brought by shareholders are inapposite. Furthermore, the circumstances of this case distinguish it from *Whalen* and *Attick*. Here, the limited partnership's assets were sold and the partnership dissolved at the time Gagan brought suit in 1987. Arizona law provides that "[a] limited partnership is dissolved and its affairs shall be wound up . . . upon the happening of events specified in the certificate of limited partnership." Ariz.Rev.Stat. § 29–344. The certificate of partnership for South Hesperia provides in pertinent part that "[t]he partnership shall be dissolved upon . . . the sale by the Partnership of all or substantially all of its assets." Therefore, when South Hesperia's assets were sold to Falcon in 1986, South Hesperia itself was dissolved. When Gagan brought suit in 1987, he was alleging injury to his business and property interest. At that time there was no basis for Gagan to bring suit on behalf of a dissolved limited partnership. In sum, Gagan alleged, and the jury found, that he, and not the limited partnership, was injured by the conspiracy to sell the limited partnership's assets and divert the proceeds from the sale.

The defendants next challenge the jury's verdict finding that they conspired to violate RICO. Sections 1962(a), (b), and (c) of RICO set out the substantive violations. Specifically, § 1962(b) makes it unlawful to "acquire or maintain . . . any interest in or control of any enterprise" through a pattern of racketeering activity. Section 1962(c) makes it unlawful "to conduct or participate . . . in the conduct of [an] enterprise's affairs through a pattern of racketeering activity. . . ." Section 1962(d), the conspiracy provision, makes it unlawful "for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) . . . ."

In his second amended complaint, Gagan alleged that the defendants violated both RICO's substantive and conspiracy provisions. As we have mentioned, the substantive claims did not fly at the first trial; they were dismissed on the defendants' motion for directed verdict. In his decision on the motion, Judge Sharp examined three alleged fraudulent schemes: fraud in the solicitation of Gagan's limited partnership investment; fraud in the operation of South Hesperia; and fraud in the sale of South Hesperia to Falcon and the allocation of sale proceeds. He found Gagan's evidence of fraud in the solicitation and operational phases lacking. He found, however, that Gagan had presented a triable issue on whether the activities in relation to the Falcon sale were fraudulent activities involving the predicate acts of securities, mail, and wire fraud. According to Judge Sharp, these predicate acts relating to the Falcon sale did not constitute a pattern of racketeering activity under RICO because the requisite element of continuity was lacking. Therefore, Judge Sharp dismissed Gagan's §§ 1962(b) and (c) claims, but authorized him to go forward on his § 1962(d) claim. As we previously reported, the jury could not agree on this claim.

Prior to the start of the second trial, Gagan asked for reconsideration and clarification of Judge Sharp's ruling on the scope of the RICO claims. Judge Rodovich, consistent with Judge Sharp's prior ruling, determined that the RICO conspiracy theory would be limited to the Falcon sale and allocation of proceeds. The second jury found for Gagan on the claim.

■ The defendants contend that the evidence was insufficient to support the conspiracy verdict. Our review on this point is limited to determining whether "the evidence presented, combined with all reasonable inferences that may be drawn from it, is sufficient to support the verdict when viewed in the light most favorable to the party winning the verdict." *Molnar v. United Technologies Otis Elevator*, 37 F.3d 335, 337 (7th Cir. 1994). The question of credibility and weight of evidence is within the purview of the jury. *Lippo v. Mobil Oil Corp.*, 776 F.2d 706, 716 (7th Cir.1985). Also, we have held that proof

by a preponderance of the evidence is sufficient to support a finding of liability under civil RICO. *Liquid Air Corp. v. Rogers,* 834 F.2d 1297, 1303 (7th Cir.1987), *cert. denied,* 492 U.S. 917, 109 S.Ct. 3241, 106 L.Ed.2d 588 (1989).

The defendants' brief does not adequately address the critical issue of "agreement," the cornerstone of a RICO conspiracy claim. We have said:

> Section 1962(d)'s target, like that of all provisions prohibiting conspiracies, is the *agreement* to violate RICO's substantive provisions, not the actual violations themselves.

*Schiffels,* 978 F.2d at 348. We have further observed, "[f]rom a conceptual standpoint a conspiracy to violate RICO can be analyzed as composed of two agreements...." *Neapolitan,* 791 F.2d at .499. The first is "an agreement to conduct or participate in the affairs of an enterprise [or to acquire or maintain any interest in or control of any enterprise] through a pattern of racketeering activity." *Id.* at 498. The second is "an agreement to the commission of at least two predicate acts." *Id.* at 499. If either aspect of the agreement is lacking then there is insufficient evidence that the defendant embraced the objective of the alleged conspiracy. Finally, a "RICO conspiracy, like all conspiracies, does not require direct evidence of agreement; an agreement can be inferred from the circumstances." *Id.* at 501 (citing *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942)).

■ Accordingly, to prevail on his claim of conspiracy to violate §§ 1962(b) and (c), it was Gagan's burden to prove by a preponderance of the evidence:

(1) that the defendants agreed to acquire or maintain an interest in or control of an enterprise or to conduct or participate in the affairs of an enterprise through a pattern of racketeering activity;

(2) that defendants further agreed that someone would commit at least two predicate acts to accomplish those goals.

It was not necessary for Gagan to prove the actual commission of predicate acts in order for him to prove a RICO conspiracy. *Schiffels,* 978 F.2d at 348. Furthermore, the defendants need not have agreed to actually commit the predicate acts themselves or even to participate in the commission of those acts so long as they agreed that the acts would be committed on behalf of the conspiracy. *United States v. Quintanilla,* 2 F.3d 1469, 1484 (7th Cir.1993); *United States v. Campione,* 942 F.2d 429, 437 (7th Cir.1991); *United States v. Glecier,* 923 F.2d 496, 500 (7th Cir.), *cert. denied,* 502 U.S. 810, 112 S.Ct. 54, 116 L.Ed.2d 31 (1991). Thus, to establish a conspiracy to violate RICO, it was sufficient that Theurer and Tripp acted on the defendants' behalf; the conspiracy defendants themselves did not have to be the ones to act. *Neapolitan,* 791 F.2d at 498 (RICO conspiracy liability is broad enough "to encompass those persons who while intimately involved in the conspiracy, neither agreed to personally commit nor actually participated in the commission of the predicate" offenses).

■ We examine first the RICO claim of conspiracy to violate § 1962(b). There is sufficient evidence, taken as a whole, which supports a finding that the defendants agreed with each other that Sharar, Trimble, and Gouyd would acquire interests in South Hesperia and the other Hesperia limited partnerships and, more specifically, that they agreed to acquire those interests through the commission of at least two predicate acts. Acquiring the limited partners' interest with funds that they had stolen or converted from the limited partners themselves, diversion of proceeds from the sale to Falcon into the ACI account controlled by Sharar, Trimble, and Gouyd, under-allocation of proceeds to South Hesperia, their letters and offers to the limited partners, and mailing of checks all suffice as overt acts. The jury could also reasonably conclude that the defendants agreed to use the mails and interstate wires to communicate with each other and with the limited partners in advancement of their scheme and also agreed that someone on their behalf would use the mails and wires to make offers to the South Hesperia partners in the four separate partnerships that would conceal important information that a reasonable investor would want to know before agreeing to sell his interest. This informa-

tion includes knowing that the offers were being made with the partners' own money which had been unlawfully diverted to the defendants from the proceeds of the Falcon sale; the offerors were insiders operating with serious conflicts of interest; and the long-term notes that would be forgiven as part of the offer were fundamentally sham and illusory in the first place. In sum, there is sufficient evidence, both direct and circumstantial, from which the jury could reasonably conclude that the defendants agreed to acquire or maintain an interest in or control of the enterprise through a pattern of racketeering activity and that they agreed to the commission of at least two predicate acts in furtherance of the conspiracy.

■ Turning to the claim of conspiracy to violate § 1962(c), there is sufficient evidence, again taken as a whole, that supports an inference that the defendants agreed with each other to conduct or participate in the affairs of an enterprise through a pattern of racketeering activity, and further agreed to the commission of at least two predicate acts on behalf of the conspiracy. From the substantial direct and circumstantial evidence introduced at trial regarding the use of interstate mails and wires to contact the limited partners, inform them of the condition of their limited partnerships, deceive them, and acquire their interests, the jury could reasonably find that the defendants agreed to conduct or participate in the conduct of the affairs of South Hesperia with respect to the Falcon sale through a pattern of mail and wire fraud by employing those modalities in a scheme to obtain money from the limited partners through false pretenses. In short, substantial evidence supports the jury's verdict of a RICO conspiracy.

The defendants also contend that the conspiracy verdict must be reversed because there was insufficient evidence of a pattern of racketeering activity. As we stated earlier, all that is required to support a RICO conspiracy violation is an agreement to acquire or maintain an interest in or control of an enterprise, or to conduct or participate in the affairs of an enterprise through a pattern of racketeering activity. Again we emphasize that the defendants only had to agree to the commission of predicate acts which themselves could form a pattern of racketeering activity; the predicate acts need not have been committed.

The concept of "pattern of racketeering activity" has become a RICO term of art without acquiring a clear meaning. RICO itself defines a pattern as requiring at least two acts of racketeering activity within ten years. 18 U.S.C. § 1961(5). In *Sedima*, the Supreme Court noted that the requirement of two or more predicate acts was a necessary but not sufficient condition to a finding of a pattern. 473 U.S. at 496 n. 14, 105 S.Ct. at 3285 n. 14. The Court reasoned that in order to establish a pattern, a plaintiff must show a relationship between the predicate acts and the threat of continued criminal activity. *Id.*

In a subsequent case, the Court stated that in RICO, Congress "envision[ed] a concept of sufficient breadth that it might encompass multiple predicates within a single scheme that were related and that amounted to, or threatened the likelihood of, continued criminal activity." *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 237, 109 S.Ct. 2893, 2899, 106 L.Ed.2d 195 (1989) (overturning a rule in the Eighth Circuit that any number of predicate acts concerning multiple victims over six years cannot constitute a RICO pattern if they relate to a single scheme). The Court held, therefore, that a single scheme could support a finding of RICO liability. *Id.* at 241, 109 S.Ct. at 2901–02. This confirmed our earlier rulings that "the mere fact that the predicate acts relate to the same overall scheme or involve the same victim does not mean that the acts automatically fail to satisfy the pattern requirement." *Morgan v. Bank of Waukegan*, 804 F.2d 970, 975–76 (7th Cir.1986); *Liquid Air*, 834 F.2d at 1304.

■ Focusing on the "continuity plus relationship" requirement explained in *Sedima*, we have noted that a determination as to whether a "pattern of racketeering activity" exists in any given situation is a fact-specific question hinging on a variety of relevant factors. *Jones v. Lampe*, 845 F.2d 755, 757 (7th Cir.1988). These factors include: (1) the number and variety of the predicate acts and the length of time over which they were

committed; (2) the number of victims; (3) the presence of separate schemes; and (4) the occurrence of distinct injuries. *Liquid Air*, 834 F.2d at 1304.

Our RICO jurisprudence is replete with examples of failed attempts to dress up state law claims as suave RICO cases using the expansive definition of mail and wire fraud. In *Lipin Enterprises, Inc. v. Lee*, 803 F.2d 322, 324 (7th Cir.1986), the plaintiffs alleged a fraudulent acquisition of stock amounted to a RICO violation because it entailed a multitude of fraudulent statements and representations transmitted through the mails and wires. We rejected that assertion, holding that just because the complexity of the transaction creates the potential for a greater number of possible fraudulent acts does not mean that there is the requisite threat of continued criminal activity. In short, a single fraudulent scheme with only one injury to one victim was not a "pattern of racketeering activity" simply because it required several acts of mail and wire fraud to inflict the single injury. In other words, "multiple acts of mail fraud in furtherance of a single episode of fraud involving one victim relating to one basic transaction cannot constitute the necessary pattern." *Jones*, 845 F.2d at 757.

In *Olive Can Co. v. Martin*, 906 F.2d 1147, 1150 (7th Cir.1990), the defendants set up a sham corporation in an attempt to divert money from their own failing cookie manufacturing business and then concealed its existence from the plaintiffs who sold them supplies on credit. The district court had found that the scam was not continuous within the meaning of RICO because it was done to pay off one of the defendants' personal obligations. *Id.* at 1151. Hence, the fraudulent scheme had a natural ending with no threat of ongoing criminal activity. We agreed and affirmed the finding of no liability. *Id.* at 1152.

*Lee* and *Olive Can* notwithstanding, the existence of a single victim does not preclude the existence of a pattern of racketeering activity. In *Liquid Air*, we were faced with deciding whether a single scheme which lasted seven months and defrauded one victim established a pattern of racketeering activity. *Liquid Air*, 834 F.2d at 1300. We held that

it did. Crucial to our conclusion was the fact that each instance of false billing inflicted an injury separate and independent of the previous and succeeding instances of false billing. "[T]he repeated infliction of economic injury upon a single victim of a single scheme is sufficient to establish a pattern of racketeering activity for purposes of civil RICO." *Id.* at 1305.

Most recently, in *Uniroyal Goodrich Tire Co. v. Mutual Trading Corp.*, 63 F.3d 516 (7th Cir.1995), we found a pattern of racketeering activity where evidence established the existence of at least four separate schemes, all of which were designed to swindle money from Uniroyal, and all utilized the mails and wires to further their ends. "The various predicates of mail and wire fraud occurred repeatedly over a period as long as three years and each scheme, though inflicted upon the same victim, caused separate and distinct injuries like those caused in *Liquid Air*." *Id.* at 524.

With these considerations in mind, we look to the relevant factors noted in *Liquid Air* and other cases. The number of victims in our case is disputed. Gagan was the only limited partner who did not sell his interest and thus was victimized by the Falcon sale and diversion of proceeds. Arguably, however, all the limited partners who sold their interests were victimized when they sold their interests. Similarly, the evidence appears to only point to one scheme—sell South Hesperia, buy back the limited partners' interests, and divert the proceeds for personal gain—however, an inference can be drawn that the various defendants certainly had the means to conduct similar schemes. The evidence demonstrates that each time Falcon paid proceeds to the ACI escrow account Gagan suffered a distinct injury.

The most relevant and dispositive factor is the number and variety of predicate acts and the length of time over which they were committed. There is sufficient evidence to show that the predicate acts could have begun as early as 1985 when the defendants agreed to sell South Hesperia's assets, develop a plan to buy out the limited partners, and agreed among themselves to divert the sale proceeds to ACI's escrow account.

The predicate acts continued in 1986 through: the use of the shell corporations, ACI and Allwave; the sale of South Hesperia and the other limited partnerships to Falcon; the payment of sale proceeds by Falcon directly into the ACI escrow account; the diversion of proceeds to Sharar, Trimble, and Gouyd; the mailing of offerings to buy out the limited partners; and the subsequent mailing of checks to the limited partners to buy back those interests. In 1987, predicate acts included the execution of the long-term notes by Sharar, Trimble, and Gouyd to buy the limited partners' long-term notes from Allwave. The predicate acts continued in 1988 and 1989 when Falcon made its two final installment payments and those funds were diverted into the ACI escrow account and ultimately into the pockets of Sharar, Trimble, and Gouyd. We find sufficient evidence from which the jury could have reasonably concluded that the defendants agreed to the commission of predicate acts over a period of 1985 to 1989 until all the monies received from the Falcon sale had been diverted to Sharar, Trimble, and Gouyd through their ACI escrow account. These acts have the requisite relatedness, and from this evidence the jury could have reasonably inferred a continuing threat of ongoing criminal activity.

When Judge Sharp granted a directed verdict for the defendants on the substantive RICO claims, he noted that the predicate acts did not show continuity. His finding is not inconsistent with the evidence presented at the second trial. There is ample evidence from which the jury could reasonably find that the defendants' agreement to the commission of the predicate acts was more encompassing than the mere predicate acts themselves.

■ Having found the requisite agreement, "[t]he second distinctive aspect of a RICO conspiracy is the need to establish the existence of an enterprise." *Neapolitan,* 791 F.2d at 499. An enterprise is "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity[.]" 18 U.S.C. § 1961(4). "[T]he central element of an enterprise is structure.

An enterprise must be more than a group of people who get together to commit a 'pattern of racketeering activity.'" *Neapolitan,* 791 F.2d at 500. An enterprise requires "an ongoing 'structure' of persons associated through time, joined in purpose, and organized in a manner amenable to hierarchial or consensual decision-making." *Jennings v. Emry,* 910 F.2d 1434, 1440 (7th Cir.1990). There need be shown "only some separate and distinct existence for the person and the enterprise." *Ashland Oil, Inc. v. Arnett,* 875 F.2d 1271, 1280 (7th Cir.1989).

■ The defendants argue they cannot be liable under RICO since they and the RICO enterprise were "one and the same." They contend that the South Hesperia limited partnership only became an enterprise at the time it was acquired by Gouyd, Sharar, and Trimble after they bought back the limited partners' interests. This contention is without merit. The district court instructed the jury that the South Hesperia limited partnership alone, and all the Hesperia partnerships together, constituted enterprises. The defendants did not object to this instruction and have waived the issue on appeal. See Rule 51, Fed.R.Civ.P. Even if not waived, the evidence at trial was sufficient for the jury to find the requisite enterprise. South Hesperia was a duly organized Arizona limited partnership which had a separate and distinct legal existence independent from each of the defendants. The acquisition of the limited partners' interests by Gouyd, Sharar, and Trimble occurred after South Hesperia's assets had been sold to Falcon. The evidence supports the conclusion that the defendants and the enterprise were not "one and the same."

■ Moving to the state law claims, the defendants allege numerous inconsistencies in the jury's verdict. First, they contend that a verdict finding no fraud against all the defendants, except Monroe, precludes a RICO verdict against those defendants. This contention is without merit and frivolous as well. As we have noted, to prevail on a § 1962(d) RICO conspiracy claim a plaintiff need only prove that defendants agreed to the commission of at least two predicate acts, not success at commission of those acts. All

that the conspiracy verdict required was an agreement and overt acts; Gagan did not have to prove that the predicate acts were actually committed or successful. *Schiffels,* 978 F.2d at 348; *United States v. Melton,* 689 F.2d 679, 683 (7th Cir.1982). Accordingly, we find no inconsistency in the jury's verdict finding only Monroe to have committed fraud, but numerous defendants to have conspired to violate RICO.

■ Next, the defendants argue that there was insufficient evidence to support the jury's verdict against Monroe on the state law fraud claim. In the absence of evidence of intentional misrepresentation and reliance, they argue, the fraud verdict against Monroe should not stand. Monroe was the general partner of South Hesperia who owed a legal duty to Gagan and the other limited partners. Gagan alleged "constructive fraud" against Monroe, an equitable theory of relief. Reviewing the record, we find ample evidence from which the jury could reasonably conclude that Monroe worked a constructive fraud on Gagan. For example, by failing to disclose that he intended to operate South Hesperia initially at a loss and ultimately for profit; by also failing to disclose that Sharar, Trimble, and Gouyd would be purchasing the limited partners' interests with the proceeds from the sale of South Hesperia to Falcon; by failing to disclose his side deal with Skulsky for him (Monroe) to take 10% of the profits on any sale of South Hesperia. In addition, the jury could have found that Monroe had a duty to disclose certain information to Gagan and the other limited partners, but omitted or concealed material facts. We will not disturb the jury's verdict finding Monroe liable for fraud.

■ The defendants also take issue with the jury's verdict against Monroe, Sharar, Trimble, and Theurer on the breach of fiduciary duty claim. They contend first that Gagan presented no evidence of any specific duty and no evidence of any specific breach by Monroe. It is axiomatic that under Arizona law Monroe, as general partner of South Hesperia, had fiduciary duties to Gagan and the other limited partners. *Jerman v. O'Leary,* 145 Ariz. 397, 402, 701 P.2d 1205, 1210 (Ariz.App.1985) (general partner stands

in a fiduciary relationship to his limited partners, and must observe "the utmost good faith" including full and complete disclosure of all important facts); *Wood v. Holiday Mobile Home Resorts, Inc.,* 128 Ariz. 274, 281, 625 P.2d 337, 344 (Ariz.App.1980) ("a general partner having complete authority to deal with the partnership business, stands in a fiduciary position to the limited partners"). Monroe argues that there was no evidence of a breach occurring with respect to the distribution of the Falcon sale proceeds. He mistakenly believes that the jury was precluded from considering evidence of Monroe's fiduciary duty to Gagan during the operational phase of South Hesperia. The limitation on evidence relating to the Falcon sale and distribution of proceeds only applied to the RICO claim, not the breach of fiduciary duty and other state law claims. As set forth above, there was ample evidence from which the jury could have concluded that Monroe breached his fiduciary duty during the solicitation, operation, and sale of South Hesperia.

■ Because Sharar and Trimble were not fiduciaries, the defendants argue next that they had no fiduciary duty which could have been breached. On this issue, the defendants have failed to adequately develop and support their argument in accordance with Rule 28(a)(6), Fed.R.App.P. ("argument must contain the contentions of the appellant on the issues presented, and the reasons therefor, with citations to the authorities, statutes, and parts of the record relied on"). They do not cite any basis, either factual or legal, for their arguments and have, therefore, waived them. *United States v. Mason,* 974 F.2d 897, 901 (7th Cir.1992). Even if considered, however, the arguments must fail. Sharar and Trimble need not have been fiduciaries themselves to be found liable for breach of a fiduciary duty. The jury was properly instructed that if it found that some of the defendants did not owe Gagan a fiduciary duty but induced others to breach their fiduciary duties, they could find those defendants liable for breaching a fiduciary duty. None of the defendants objected to this instruction, and the jury verdict against Sharar and Trimble on the breach of fiduciary duty will not be set aside.

Theurer argues separately that the evidence was insufficient to find him liable for breaching a fiduciary duty. He contends that his role as "de facto" bookkeeper/accountant for the Hesperia partnerships does not create a fiduciary relationship between himself and Gagan, a limited partner in South Hesperia. He argues that he was not an accountant who owed any fiduciary duty to the limited partnership and its individual partners. While he argued at trial that he was a financial consultant rather than an accountant, the jury could have reasonably concluded from the evidence that he was in fact an accountant for South Hesperia who owed plaintiff a fiduciary duty which he breached. Furthermore, even if the jury did not find Theurer to be an accountant who owed Gagan a fiduciary duty, the jury could have reasonably concluded from the evidence that Theurer induced a breach of fiduciary duty by Monroe, thus finding Theurer liable for a breach of that duty.

Theurer also contends that the court gave an improper jury instruction on the issue of fiduciary duty. In his brief, however, Theurer concedes that he did not object to that portion of the jury instruction which he now questions on appeal. Accordingly, he has waived his objection to the instruction under Rule 51, Fed.R.Civ.P. ("No party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection.")

Moving on, defendants assert insufficiency of the evidence with respect to another count—Monroe's breach of the partnership agreement. This argument is also based upon the flawed premise that evidence regarding the plaintiff's state law contract claims was limited to the sale to Falcon and the distribution of sale proceeds. However, there was no limitation on the state law claims. Only the RICO claim was tried under the limitation, and so we find ample evidence to support the jury's verdict. The jury could have reasonably concluded that Monroe breached the partnership agreement by failing to disclose the negotiations for the sale of South Hesperia, by failing to obtain the limited partners' written consent to the sale of all of its assets, and, most importantly, by distributing those sale proceeds to Sharar, Trimble, and Gouyd. The jury's verdict on this count will stand.

The defendants raise other alleged inconsistencies with the verdict. First, they contend that since Monroe was the only defendant found liable for fraud this "would appear to vitiate the RICO verdict" as there can be no conspiracy of one. But as we have discussed, the conspiracy verdict only required an agreement and overt acts, not success at committing the substantive offenses. *Schiffels*, 978 F.2d at 348.

Next, the defendants take issue with the jury's verdict against them on the unjust enrichment claim. They contend that the verdict failed to provide for allocation of damage as to each defendant and amount and, furthermore, there is insufficient evidence to justify an award of unjust enrichment without such allocation. They also allege an inconsistency in that there was no specific breakdown of the theories on which the jury awarded punitive damages, or any segregation of the RICO and state law awards. These arguments are waived for two reasons which are common to this appeal. When specifically asked, defendants failed to object to the proposed jury verdict form and its single damages question. It is axiomatic that arguments not raised below are waived on appeal. *Jean v. Dugan*, 20 F.3d 255, 265 (7th Cir.1994). Even had they objected, defendants have also waived their arguments on this issue by failing to cite any basis, either factual or legal, for their arguments. *Mason*, 974 F.2d at 901.

We reach next the issue of plaintiff's motion in limine. On the first day of the second trial, Judge Rodovich granted the plaintiff's motion in limine to exclude evidence concerning the tax benefits Gagan may have received as a result of his investment in South Hesperia. The court ruled that under the case authority, Gagan is entitled to a full and complete recovery for any wrongdoing that the jury may find the defendants committed. We review a motion in limine ruling,

as any other evidentiary ruling, under an abuse-of-discretion standard. *Calusinski v. Kruger*, 24 F.3d 931, 934 (7th Cir.1994). An abuse of discretion occurs "only in situations in which no reasonable person could agree with the district court." *Mares v. Busby*, 34 F.3d 533, 535 (7th Cir.1994).

In moving to exclude evidence of tax benefits, Gagan relied on the case of *Fleischhauer v. Feltner*, 879 F.2d 1290 (6th Cir.1989), *cert. denied*, 493 U.S. 1074, 110 S.Ct. 1122, 107 L.Ed.2d 1029 (1990). In that case, the court rejected the argument that tax benefits could be used to offset RICO damages for two reasons. First, a RICO plaintiff is entitled to "a complete recovery." *Id.*, 879 F.2d at 1301 (citing two of our decisions, *Carter v. Berger*, 777 F.2d 1173, 1176 (7th Cir.1985), and *Liquid Air*, 834 F.2d at 1310). Second, "denying defendants the benefit of offsetting tax benefits generated by their illegal offering is an appropriate result" which will serve to deter fraudulent conduct. *Fleischhauer*, 879 F.2d at 1301 (citing *Randall v. Loftsgaarden*, 478 U.S. 647, 664, 106 S.Ct. 3143, 3153–54, 92 L.Ed.2d 525 (1986)). The defendants opposed the motion on grounds that the evidence was relevant to the issue of damages.

On appeal, the defendants argue that the tax evidence was relevant and material and should not have been excluded. That the court found the evidence irrelevant to the issue of either liability or damages was well within its discretion under Rule 402, Fed. R.Evid. Furthermore, even had the court found the evidence marginally relevant, balancing the Rule 403, Fed.R.Evid. factors—the obvious danger of unfair prejudice, confusion of issues, undue delay, and waste of time—to exclude the evidence would not constitute an abuse of discretion.

■ During the trial, the defendants moved for reconsideration on the issue of tax evidence. In denying the request, Judge Rodovich noted that he "did not believe that tax shelters are an issue in this case." On appeal, the defendants argue that Gagan opened the door on the issue by eliciting evidence regarding tax shelters. Reviewing the evidence demonstrates that Gagan only elicited general information regarding tax benefits. The motion in limine prohibited evidence as to the specific amount of tax benefits received by Gagan, not general evidence as to the fact that there were tax issues and ramifications involved in the case. None of the admitted evidence "opened the door" to proof of the specific dollar amount of any tax benefits Gagan may have received. We find nothing in the record which convinces us that the judge abused his discretion in rejecting the defendants' offer of proof and denying their motion for reconsideration.

The motion in limine is also related to the defendants' counterclaim which the jury rejected at the trial. On appeal, the defendants request a new trial on their counterclaim, claiming that if the court had permitted them to introduce evidence of tax shelter benefits, the jury may have found in their favor. Having found no abuse of discretion by the court when it granted Gagan's motion in limine, we reject the defendants' request for a new trial on its counterclaim.

■ The defendants also appeal the trial court's decision to deny their motion for summary judgment. That decision was rendered back in September 1990 at the same time the court granted and denied, in part, the defendants' motion for directed verdict. Now, after two jury trials and nearly eight years since this action was commenced, we decline the invitation to reconsider the denial of the defendants' motion for summary judgment. *See Watson v. Amedco Steel, Inc.*, 29 F.3d 274, 275 (7th Cir.1994); *Marshall v. Porter County Plan Comm'n*, 32 F.3d 1215, 1220 (7th Cir.1994); *but see Downes v. Volkswagen of America, Inc.*, 41 F.3d 1132, 1138 (7th Cir.1994).

■ Finally, Theurer claims error in the district court's refusal to dismiss the case against him on the grounds of a purported discharge in bankruptcy. In 1992, Theurer filed for bankruptcy in the Central District of California. That court entered an order of discharge on April 13, 1992. At the opening of the second trial on July 11, 1994, Judge Rodovich inquired as to the pleadings Theurer filed on June 20, 1994, which included a motion to dismiss all claims based upon his

bankruptcy. Judge Rodovich denied Theurer's motion to dismiss because "discharge in bankruptcy" is an affirmative defense that Theurer failed to plead under Fed.R.Civ.P. 8(c). Theurer tried to amend his answer, but that request was denied. We review a denial of a motion for leave to amend a pleading under an abuse of discretion standard. *Moore v. Indiana*, 999 F.2d 1125, 1128 (7th Cir.1993).

The district court acted reasonably and within its discretion in denying Theurer leave to amend. The court noted that Theurer's delay of over two years in seeking relief from the court for his purported discharge was a factor in its decision. The date of Theurer's purported discharge was April 13, 1992, yet he did not raise the claim before Judge Rodovich until the eve of trial in July 1994. Significantly, Theurer's active participation in two settlement pretrial conferences is inconsistent with his claim of discharge. We find no abuse of discretion when the court denied the motion to leave based upon Theurer's failure to raise it as an affirmative defense.

Furthermore, Theurer's purported defense of discharge was insufficient as a matter of law. The record fails to disclose any notice or actual knowledge on Gagan's part of Theurer's bankruptcy proceeding. Theurer's own motion, which attached his bankruptcy court schedule of creditors, did not list Gagan as a creditor or give his address. Instead, it listed this case and gave the address of the South Bend division of the district court. Since Gagan had no notice of Theurer's bankruptcy until after the April 13, 1992, discharge order, that order did not discharge Theurer's debt in this case. 11 U.S.C. § 523(a)(3)(B).

Theurer cites *In re Stark*, 717 F.2d 322 (7th Cir.1983), for the proposition that since his was a "no asset" case he may reopen his bankruptcy, amend his schedules to list Gagan, and thus obtain a discharge of the debt to the plaintiff. *Stark* is distinguishable from this case. In *Stark* the debtors sought to reopen their bankruptcy estate for purpose of listing an additional creditor. The bankruptcy court denied the motion; the district court reversed. We affirmed, finding the debtor could reopen the estate where there was no evidence of fraud or intentional design and the creditor was not harmed in any way. *Id.* at 324. In this case, if Theurer wants to reopen his bankruptcy to amend his schedule to list Gagan as a creditor, he must look first to the bankruptcy court. Contrary to Theurer's assertion, it was his responsibility, not the bankruptcy or district courts', to give Gagan notice of his bankruptcy and to properly list Gagan on his schedule of creditors.

For all of these reasons, we AFFIRM the judgment of the district court.