**BIXBY'S FOOD SYSTEMS, INC., Plaintiff,**

**v.**

**Jan and Phillip McKAY, Defendants.**

**Jan and Phillip McKAY, Counterplaintiffs,**

**v.**

**BIXBY'S FOOD SYSTEMS, INC., Ken Miyamoto, Mike's Stopulos, Mary Fran Stopulos, Allen Freed, Lee Staak, and Jeff Schuett, Counterdefendants.**

**No. 96 C 3915.**

United States District Court, N.D. Illinois, Eastern Division.

Nov. 21, 1997.

---

Henry T. Kelly, O'Keefe, Ashenden, Lyons & Ward, Chicago, IL, for Plaintiff.

Patrick M. Griffin, Shearer, Blood, Agrella & Boose, St. Charles, IL, for Defendant.

John A. Cotter, Larkin, Hoffman, Daly & Lindlren, Bloomington, MN, for Counterplaintiffs.

Eugene F. Friedman, Chicago, IL, for Counterdefendants.

## MEMORANDUM ORDER

BOBRICK, United States Magistrate Judge.

Before the court are the motions of counterdefendants Bixby's Food Systems, Inc. ("Bixby"), Ken Miyamoto, and Mary Fran Stopulos (collectively, "Bixby counterdefendants"), and Mike Stopulos to dismiss certain counts of the Counterclaim of Jan and Phillip McKay.

This case stems from a franchise agreement between Bixby and the McKays. Bixby is a franchisor of bagel restaurants that operate under the name "Bixby's Bagel Company." On March 25, 1995, Bixby entered into a franchise agreement with Jan and Phillip McKay ("the McKays"). Essentially, Bixby exchanged its expertise, research, and resources for royalty payments from the McKays. According to Bixby, however, the McKays never made payments, and Bixby terminated the agreement on June 6, 1996. Thereafter, again according to Bixby, the McKays continued to operate their restaurant using the "Bixby" name. Bixby filed suit against the McKays for violation of the franchise agreement and misappropriation of Bixby's trade dress and trademark. In response, the McKays filed an eight-count counterclaim, alleging violations of the franchise laws of Illinois, Minnesota, and Iowa, the Illinois Consumer Fraud and Deceptive Business Practices Act ("Fraud Act"), and the Racketeer Influenced and Corrupt Organizations Act ("RICO"). They also bring common law claims of fraud, breach of contract, and breach of fiduciary responsibility. In addition to Bixby, they name Ken Miyamoto, the president and co-owner of Bixby, Alan Freed, the vice president of Bixby's operations and marketing, Mary Fran Stopulos, vice president and co-owner of Bixby, and Mike Stopulos, co-founder of Bixby's predecessor in interest.

The counterdefendants have proceeded in a somewhat awkward fashion. They move to dismiss certain claims against certain counterdefendants, filing four separate motions to dismiss supported by three different memoranda.[1] They alternate between advancing

---

1. Freed, for one, moves for dismissal of all claims against him without prejudice for the McKays' failure to serve him within 120 days as per Fed.R.Civ.P. 4(m). Under that rule, the court may either dismiss the action without prejudice or direct that service be made within a specified time, but if the plaintiff shows good cause, the court must extend the time for service. *Panaras v. Liquid Carbonic Industries Corp.*, 94 F.3d 338, 339 (7th Cir.1996). The McKays' excuse here is that they did not have Freed's correct address. They do not detail their efforts to obtain the address, but state that they asked the attorney for Bixby, Ms. Renee Jackson, to accept

separate arguments, adopting the arguments of co-counterdefendants, or echoing the arguments of co–counterdefendants. In the final analysis, it would appear that the claims at issue here are:

Count I: under Illinois' Franchise Disclosure Act against Mike and Mary Fran Stopulos and Freed;

Count II: under Minnesota's Franchise Act against Mike and Mary Fran Stopulos and Freed;

Count III: under Iowa's Franchise Act against all counterdefendants;

Count IV: under Illinois' Fraud Act against all counterdefendants;

Count V: common law fraud against Mike Stopulos and Freed;

Count VI: breach of fiduciary duty against all counterdefendants;

Count VIII: under RICO against Miyamoto and Freed.

We will address the sufficiency of each of these claims in the context of counterdefendants' arguments for dismissal.

## I.   COUNTERPLAINTIFFS' ALLEGATIONS

The McKays became aware of Bixby franchises through a friend, Daniel Burich, who happened to have a development agreement with Bixby for central Illinois. The McKays arranged to meet with Miyamoto and he gave them a Franchise Offering Circular ("FOC") dated September 6, 1994 ("FOC# 1"). The FOC# 1 included investment, sales, and earning information, and Miyamoto told the McKays that the figures were conservative, and that some stores were bringing in $1 million in revenues annually. Miyamoto also said he would buy the McKays' franchise back if they were unsatisfied. By November of 1994, the McKays were persuaded and wrote Bixby a check for $15,000. Miyamoto sent them a development agreement for their signatures. It gave the McKays one year in which to purchase a franchise in the Kane County area. They executed and returned the agreement by mail on December 15, 1994.

The McKays, along with Mike Stopulos and Miyamoto, found a 2000–square–foot location in Geneva. Although Miyamoto had recommended a 1600– to 2400–square–foot space as appropriate, he urged the McKays to lease an additional space, bringing the size to over 3000 square feet. He represented to the McKays that with such a space, revenues would be over $1 million annually. Mike Stopulos assured the McKays as well.

On April 11, 1995, Bixby hosted a reception for existing and prospective franchisees, including the McKays, in Bettendorf, Iowa. The McKays were given a second Franchise Offering Circular dated March 31, 1995 ("FOC# 2"). At that time, Miyamoto indicated that Bixby had 340 signed, pre-paid development agreements, when in fact it had approximately ten. On April 18, 1995, Miyamoto was in Illinois for a grand opening, and stopped to see Phil McKay in Elgin. He persuaded Phil McKay to sign a Franchise Agreement and tender a check for $17,500. He then proceeded to Bloomington, where Jan McKay signed the agreement as well. Later, Miyamoto backdated the signatures to March 24 and 31, 1995.

On May 8, 1995, based on the recommendations of Miyamoto and Mike Stopulos, the McKays executed a lease for 3000 square feet at the Geneva location. At about the same time, Bixby distributed a newsletter claiming, again, the 340 signees and indicating they were worth $68 million in revenue.

Between January and October, 1995, the McKays paid $325,000 to Bixby in franchise and development fees. They began construction at the Geneva location, and learned that the initial cost of purchase and construction grossly exceeded the figures in FOC# 1 and FOC# 2, which were $143,000–$198,000 and $235,000–$319,000. The McKay's costs exceeded $400,000. Miyamoto and other Bixby representatives assured the McKays that sales would cover their costs. The McKay's sales, however, fell short of the figures tout-

service but that she declined as she did not represent Freed. They do not appear to have moved for an extension of time, which in and of itself is indicative of a lack of diligence. *Bachen-*

*ski v. Malnati,* 11 F.3d 1371, 1377 (7th Cir.1993). Accordingly, the McKays have not shown good cause and the court will dismiss Freed as a counterdefendant without prejudice.

ed in FOC# 1 and FOC# 2. As a result, they were unable to pay creditors and feasibly continue operation of their restaurant. Bixby terminated the franchise agreement with the McKays on June 10, 1996, due to the McKays' inability to pay royalty fees. Thereafter, the parties agreed to submit to mediation but, during its pendency, Bixby initiated this lawsuit.

The McKays bring three franchise act claims, one each under the applicable statute of Illinois, Minnesota, and Iowa. The parties agree that the Iowa claim is inapplicable here and should be dismissed. (*Counterplaintiffs' Response to Partial Motions to Dismiss* ("*Cpl.Rsp.*"), at 6). The remaining two claims are based on alleged misrepresentations in the FOCs. The McKays also bring a claim under the Illinois Fraud Act, which is based on the FOCs the McKays received and a further FOC distributed in May of 1996. These alleged misrepresentations also provide the basis for a common law fraud count. Further, the McKays claim that the counterdefendants' conduct amounted to a breach of fiduciary duty they owed the McKays. Finally, the McKays characterize Miyamoto's actions as violating RICO. Now, certain of the counterdefendants are moving for dismissal of various counterclaims against them. We consider these claims under the applicable standard.

## II. ANALYSIS

In considering a motion to dismiss, we accept as true all well-pleaded factual allegations and draw all possible inferences in favor of the plaintiff. *In re HealthCare Compare Corp. Securities Lit.*, 75 F.3d 276, 279 (7th Cir.1996). A complaint will not be dismissed unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of her claim which would entitle it to relief. *Id.* With these standards in mind, we address each of the counterclaims at issue herein.

### A. Franchise Act Claims

■ The McKays bring Counts I and II under the Illinois Franchise Disclosure Act ("IFDA") and the Minnesota Franchise Act ("MFA"). Counterdefendants Mike and Mary Fran Stopulos and Freed move for dismissal of these counts as against them. Mike Stopulos argues that he is outside the scope of persons potentially liable under these acts, and both counterdefendants argue that the McKays have failed to adequately allege they participated in a violation of these acts.

The provision of the IFDA at issue here is:

Every person who directly or indirectly controls a person liable under this Section ... every partner in a firm so liable, every principal executive officer or director of corporations so liable, every person occupying a similar status or performing similar functions, and every employee of a person so liable, who materially aids in the act or transaction constituting a violation, is also liable jointly and severally with and to the same extent as such person, unless said person who otherwise is liable had no knowledge of the facts, acts or transactions constituting the alleged violation.

815 ILCS 705/26. The MFA provision, Minn. Stat. § 80C.17, is essentially identical. According to Mike Stopulos, the McKays have failed to allege he is a person within the ambit of the two sections. The McKays allege that Mike Stopulos is a co-founder of Bixby's predecessor, and investigated sites with Miyamoto and the McKays, and acted with Miyamoto in assuring the McKays with regard to the space in Geneva. (*CCL*, ¶¶ 5, 23, 25). At the very least, these allegations cloak Mike Stopulos with performing "similar functions" as—indeed, performing them in conjunction with—an officer like Miyamoto. This is sufficient to withstand a motion to dismiss.

■ Beyond the scope of liability argument, Mike and Mary Fran Stopulos and Freed argue that the McKays fail to allege that they "materially aid[ed] in the act or transaction constituting the violation." The McKays allege that Mary Fran Stopulos was the co-owner, director, vice president and secretary of Bixby; as noted above; they allege that Freed was vice president of operations and marketing; they allege Mike Stopulos was the co-founder of Bixby's predecessor. Essentially, the McKays then allege that Bixby and the individual counterdefen-

dants perpetrated a fraud upon them by inducing them to purchase a franchise through various misrepresentations and omissions of facts related to the purchase. They specifically allege that Mike Stopulos participated in the transaction, and they claim Mike and Mary Fran Stopulos and Freed had knowledge of the fraudulent misrepresentations and omissions that drove the transaction. Freed participated in the dissemination of information essential to the transaction. That is sufficient to withstand a motion to dismiss.

The court in *Vukusich v. Comprehensive Accounting Corp.*, 150 Ill.App.3d 634, 103 Ill.Dec. 794, 501 N.E.2d 1332 (2nd.Dist.1986), had occasion to consider the language at issue. There, the plaintiff brought a complaint under IFDA which in part sought damages from individuals "solely on the basis of their status as persons who 'directly or indirectly control persons liable under ... [IFDA]' or are 'principal executive officers or directors' of [the defendant corporation]." 150 Ill.App.3d at 636, 103 Ill.Dec. 794, 501 N.E.2d at 1333. The court stated that if the defendant corporation were found liable, the individuals "may also be found jointly and severally liable with [the corporation] unless they had no knowledge or reasonable basis to have knowledge of the facts, acts or transactions constituting the alleged violation." 150 Ill.App.3d at 641–42, 103 Ill.Dec. 794, 501 N.E.2d at 1337. Here, we have two individuals named as a vice presidents and director. The other's capacity is unknown at this point, but he certainly is alleged to have acted as someone with some authority in the corporation. Accordingly, their liability at this early stage of the proceedings is interwoven with that of Bixby under the IFDA and, similarly, under MFA. Accordingly, we find the McKays have adequately stated claims in Counts I and II.

### B. *Fraud Act Claim*

■ The McKays bring Count IV under the Fraud Act. The counterdefendants have moved to dismiss this count, arguing that the McKays do not have standing to bring such a claim. They submit that the Fraud Act pertains to protection of consumers and the McKays do not fit that description in this instance. Further, they argue that while business entities are allowed to bring Fraud Act claims under certain circumstances, those circumstances are not present here.

The McKays maintain that they are not a business entity; instead they argue that they are entitled to sue as consumers of Bixby's products. Specifically, they allege that they purchased Bixby's product when they purchased, first, development rights and later, franchise rights. Under the Fraud Act, a consumer is defined as "any person who purchases or contracts for purchase merchandise not for resale in the ordinary course of his trade or business but for his use or that of a member of his household." 815 ILCS § 505/1(e); *Serpico v. Menard, Inc.*, 927 F.Supp. 276, 282 (N.D.Ill.1996). Merchandise, in turn, is broadly defined as including "any objects, wares, goods, commodities, intangibles, real estate situated outside of the State of Illinois, or services." 815 ILCS § 505/1(b); *Scarsdale Builders, Inc. v. Ryland Group, Inc.*, 911 F.Supp. 337, 339 (N.D.Ill.1996). Counterdefendants fail to explain why franchise rights would not come under this expansive definition, perhaps falling into the category of intangibles. Indeed, in interpreting the Fraud Act's predecessor, the court in *People ex rel. Scott v. Cardet International*, 24 Ill.App.3d 740, 321 N.E.2d 386 (1st Dist.1974) considered franchises to be intangibles and, therefor, merchandise under the Consumer Fraud Act. 24 Ill.App.3d at 744, 321 N.E.2d at 390. This would bring the McKays within the definition of "consumers." Consequently, the counterdefendants have failed to convince us that the McKays will be unable to prove any set of facts that would entitle them to relief under the Fraud Act.

■ In addition to the counterdefendants' general argument, Mike and Mary Fran Stopulos argue that the McKays' claim against them must be dismissed because the McKays have not alleged that they made affirmative misrepresentations. The elements of a claim under the Fraud Act do not require such an allegation, however, since the Fraud Act addresses "deceptive acts or practices." *Perona v. Volkswagen of America, Inc.*, 292Ill.App.3d 59, 225 Ill.Dec. 868, 873,

684 N.E.2d 859, 864 (1st Dist.1997). An omission or concealment of a material fact in the conduct of trade or commerce constitutes consumer fraud. *Connick v. Suzuki Motor Company, Ltd.*, 174 Ill.2d 482, 504, 221 Ill. Dec. 389, 400, 675 N.E.2d 584, 595 (1997). The McKays have adequately pleaded that the counterdefendants conduct in inducing them to purchase a franchise was a deceptive practice, driven by false FOCs misrepresentations that none of the counterdefendants bothered to clarify or correct. At this early stage in this proceeding, their claims should be allowed to stand.

### C. Common Law Fraud

The McKays bring a common law fraud claim under Count V, which counterdefendants Mike Stopulos and Freed moves to dismiss. They argue that the McKays have failed to allege that they made any untrue statements to the McKays. The basic elements of common law fraud are: (1) a false representation of a material fact; (2) by a party who knows or believes it to be false; (3) with the intent to induce a plaintiff to act; (4) action in reliance on the statement; and (5) injury to the plaintiff as a consequence of that reliance. *Washington Courte Condominium Ass'n v. Washington–Golf Corp.*, 267 Ill.App.3d 790, 814–15, 205 Ill.Dec. 248, 265, 643 N.E.2d 199, 216 (1st Dist.1994). An affirmative statement is not always required, however, and fraud may also consist of the omission or concealment of a material fact if accompanied by the intent to deceive under circumstances which create the opportunity and duty to speak. *Id.* This—omission or concealment of material facts—is the basis of the McKays' fraud claim. Accordingly, the argument of Freed and Mike Stopulos are unavailing.

### D. Breach of Fiduciary Duty

In Count VI, the McKays charge the counterdefendants with breaching the fiduciary duty they owed the McKays. The counterdefendants move to dismiss this count, arguing that they owed no fiduciary duty to the McKays as a matter of law. It is well established under Illinois law that parties to a contract, including a franchise con-tract, do not owe a fiduciary duty to one another. *Oil Exp. Nat., Inc. v. Burgstone*, 958 F.Supp. 366, 370 (N.D.Ill.1997). On the other hand, a fiduciary relationship may be found where special circumstances exist. Id. In a contract situation, however, the allegation that "one businessman simply trusted another to fulfill his contractual obligations" is insufficient to state a fiduciary duty. *Id.* (*quoting Carey Electric Contracting, Inc. v. First National Bank of Elgin*, 74 Ill.App.3d 233, 30 Ill.Dec. 104, 392 N.E.2d 759, 764 (1979)). Nor does "trust between friends or businesses, plus a dominant business position ... operate to turn a formal, contractual relationship into a fiduciary relationship." *Id.* at 370–71 (*quoting Carey*, 30 Ill.Dec. 104, 392 N.E.2d at 763–64). Here, all the McKays allege is that they were introduced to counterdefendants through a friend and that they "reposed their complete trust and confidence in Bixby's," (*CCL*, ¶¶ 14–17, 76). Such allegations are insufficient to adequately claim the existence of a fiduciary relationship. Accordingly, Count VI must be dismissed.

### E. RICO Claims

Under Count VIII of their countercomplaint, the McKays contend that Miyamoto and Alan Freed engaged in conduct that violated RICO. 18 U.S.C. § 1962(c). Originally, RICO was intended as an "attempt to eradicate organized, long-term criminal activity." *Mira v. Nuclear Measurements Corp.*, 107 F.3d 466, 473 (7th Cir. 1997). In a civil suit, it allows a plaintiff to recover treble damages, costs, and attorney's fees, if it can establish the following elements:

> (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. A pattern of racketeering activity consists of at least two predicate acts of racketeering committed within a ten-year period. Predicate acts are indictable under a specified list of criminal laws.

*Id.* Where the predicates a plaintiff relies upon are acts of fraud, each must be pleaded with particularity. Fed.R.Civ.P. 9(b); *Emery v. American General Finance, Inc.*, 71

F.3d 1343, 1348 (7th Cir.1995). Here, the McKays charge Miyamoto and Freed with the predicate acts of mail fraud, 18 U.S.C. § 1341, and wire fraud, 18 U.S.C. § 1343.

We move to the requirement that plaintiffs plead a "pattern of racketeering." The concept of a "pattern" is a RICO term of art that has essentially escaped definition; the Supreme Court has stated that it requires "continuity plus relationship" in terms of predicate acts. *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985). The Seventh Circuit has fashioned a list of factors to consider to determine whether a pattern has been pleaded: (1) the number and variety of predicate acts and the length of time over which they were committed; (2) the number of victims; (3) the presence of separate schemes; and (4) the occurrence of distinct injuries. *Gagan v. American Cablevision, Inc.,* 77 F.3d 951, 962–63 (7th Cir.1996). Here, most of these factors weigh against the McKays' allegations.

The McKays allege six mailings on Miyamoto's part, beginning December 15, 1994 and ending September 2, 1995. They are:

1) Franchise Development Agreement for the McKays' signatures on December 15, 1994;

2) Memorandum stating, "we can't lose Geneva site," on March 11, 1995;

3) Memorandum with Franchise Agreement requesting signatures on March 24, 1995;

4) Memorandum suggesting the McKays fly to Kansas City to see a store the size of the Geneva site on March 28, 1995;

5) Memorandum stating Geneva site had estimated potential for $1 million on May 26, 1995;

6) Memorandum confirming the figures in FOC# 2 on September 2, 1995.

(*Counterclaims ("CC"),* at ¶ 86). The McKays also cite other mailings not ascribed to Miyamoto, one by Freed:

1) Bixby mailing FOC# 1 to Illinois Attorney General to maintain registration in Illinois on January 10, 1995;

2) Freed mailing memorandum to McKays and others inviting them to the Iowa reception on March 21, 1995;

3) Bixby mailing newsletter to potential franchisees regarding the 340 franchisees in May, 1995.

4) Bixby mailing FOC# 2 to Illinois Attorney General on September 28, 1995;

5) Bixby mailing FOC# 3 to Illinois Attorney General on June 14, 1996.

(*Id.*). Thus, as for Miyamoto, there are six mailings spread over 81/2 months; for the entire alleged scheme, there are eleven mailings over 18 months.

Consideration of the McKays' allegations in light of the first factor—number and variety of predicate acts and length of time over which they were committed—weighs in favor of dismissal of their RICO claim. The McKays alleges several instances of mail fraud.[2] The Seventh Circuit has long held that:

[m]ail and wire fraud are perhaps unique among the various sorts of 'racketeering activity' possible under RICO in that the existence of a multiplicity of acts ... may be no indication of the requisite continuity of the underlying fraudulent activity. Thus, a multiplicity of mailings does not necessarily translate directly into a 'pattern' of racketeering activity.

*Vicom, Inc. v. Harbridge Merchant Services, Inc.,* 20 F.3d 771, 781 (7th Cir.1994). Thus, the fact that the McKays allege six—or even eleven—mailings is of little consequence. Further, they fail to allege a variety of predicate acts—they allege only mail fraud. *Vicom,* 20 F.3d at 781.

The last part of the first factor—duration—also weighs against the McKays' claim, especially as alleged against Miyamoto. Miyamoto's alleged mailings occurred over an 81/2–month span. Seventh Circuit cases have been consistent in holding that a period of less than nine months is insufficient to support a RICO claim. *Vicom,* 20 F.3d at

---

**2.** The McKays' allegations of wire fraud fail to meet the requirements of Fed.R.Civ.P. 9(b). *Jep-* *son, Inc. v. Makita Corp.,* 34 F.3d 1321, 1328 (7th Cir.1994).

810

780; *Midwest Grinding Co., Inc. v. Spitz,* 976 F.2d 1016, 1024 (7th Cir.1992) (collected cases). Freed's single mailing obviously falls far short. Accordingly, we cannot find any of the elements of the first factor—number and variety of acts or duration—support the McKays' RICO claim.

The second factor—number of victims—also weighs against the McKays' RICO count. The McKays argue that there were many victims of the counterdefendants' actions, but their complaint alleges a single victim—themselves. The McKays provide no names of other victims, no dates or details of other transactions. Such allegations are required in this instance. *Emery v. American General Finance, Inc.,* 71 F.3d 1343, 1349 (7th Cir.1995). As a result, the McKays' allegations are insufficient with regard to number of victims as well.

The two remaining factors also weigh in favor of dismissal of the McKays' RICO count. The third factor is the presence of separate schemes. Here, the McKays allege a single scheme: one to defraud them out of the cost of a Bixby franchise. They admit as much but contend—wrongly, as it turns out—that the remaining factors offset the lack of multiple schemes by weighing heavily in their favor. (*Pl.Rsp.* at 15–16). Finally, we turn to the fourth factor—distinct injuries—which also favors dismissal. The complaint alleges, basically, that the counterdefendants defrauded the McKays out of the cost of a Bixby's franchise. This is essentially one injury, as opposed to multiple economic injuries over a period of time, as with a scheme involving multiple transactions. *See Liquid Air Corp. v. Rogers,* 834 F.2d 1297, 1304–05 (7th Cir.1987). Here, the McKays allege multiple acts of mail fraud related to one basic—albeit complex—transaction; such allegations are insufficient to make out a RICO claim. *Gagan,* 77 F.3d at 963; *Uniroyal Goodrich Tire Co. v. Mutual Trading Corp.,* 63 F.3d 516, 523 (7th Cir.1995). Because all four of the relevant factors weigh against the McKays' RICO allegations, their RICO claim under Count VIII must be dismissed.

### III. CONCLUSION

For the foregoing reasons, it is hereby ordered that the counterdefendants' motions to dismiss certain counterclaims are GRANTED as to Counts III, VI, and VIII, but DENIED as to Counts I, II, IV, and V. It is further ordered that this matter is dismissed without prejudice as to Alan Freed.