**WALSH CHIROPRACTIC, LTD., Individually and on Behalf of Others Similarly Situated, Plaintiff,**

v.

**STRATACARE, INC., Defendant.**

**Civil No. 09–1061–MJR.**

United States District Court, S.D. Illinois.

Sept. 30, 2010.

Andrew W. Kuhlmann, Jonathan B. Piper, Robert W. Schmieder, II, Lakinchapman, LLC, Wood River, IL, for Plaintiff.

James Jason Coggins, Richard John Leamy, Wiedner & McAuliffe, Ltd., Chicago, IL, for Defendant.

## MEMORANDUM AND ORDER

REAGAN, District Judge:

### A. *Introduction*

On November 6, 2009, Plaintiff, Walsh Chiropractic, Ltd. ("Walsh"), filed this putative class action in the Third Judicial Circuit Court in Madison County, Illinois, alleging various breach of contract theories and a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (ICFA), 815 ILCS 505/1 et seq., (Doc. 9–1). On December 17, 2009, Walsh filed its First Amended Class Action Complaint, adding two additional counts: one for unjust enrichment and the other alleging violations of the Racketeer Influenced and Corrupt Organizations Act (RICO) 18 U.S.C. §§ 1962(c), 1964(c) (Doc. 9–2). Defendant, StrataCare, Inc. ("StrataCare") removed this action on December 28, 2009, pursuant to 28 U.S.C. § 1441, alleging this Court has federal question, supplemental, and diversity jurisdiction over the subject matter in dispute. 28 U.S.C. §§ 1331, 1367(a) and 1332(a)(1), respectively (Doc. 9). StrataCare then filed a Motion to Dismiss all seven of Walsh's counts pursuant to Federal Rule of Civil Procedure 12(b)(6) (Doc. 20). The motion has been fully briefed by the parties, and the Court now rules as follows.

### B. *Jurisdictional Analysis*

As an initial matter, the Court notes the basis for its subject matter jurisdiction in this case. *See Foster v. Hill,* 497 F.3d 695, 696–97 (7th Cir.2007) ("It is the responsibility of a court to make an independent evaluation of whether subject matter jurisdiction exists in every case."). This case was filed originally in the Circuit Court of the Third Judicial Circuit, Madison County, Illinois, and comes to this Court on removal from state court. StrataCare asserts federal subject matter jurisdiction on the basis of 28 U.S.C. § 1331, which grants federal courts jurisdiction over cases arising under the laws of the United States, because Walsh brings a claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq. See Bennett v. Southwest Airlines Co.,* 484 F.3d 907, 909 (7th Cir.2007), *citing American Well Works Co. v. Layne & Bowler Co.,* 241 U.S. 257, 36 S.Ct. 585, 60 L.Ed. 987 (1916) (a claim arises under federal law within the meaning of Section 1331 if federal law creates the Plaintiff's cause of action). Because Walsh asserts a claim arising under federal law, Walsh's pendent state-law claims are within the Court's supplemental jurisdiction. *See* 28 U.S.C. § 1367.

However, although Walsh's state-law claims are within the Court's supplemental jurisdiction, it is unnecessary for the Court to exercise such jurisdiction because StrataCare asserts an additional basis for federal jurisdiction; in this case, diversity of citizenship pursuant to 28 U.S.C. § 1332, as amended by the Class Action Fairness Act of 2005 ("CAFA"), Pub.L. No. 109–2, 119 Stat. 4 (codified in scattered sections of 28 U.S.C.). Under the CAFA, federal courts have jurisdiction, with specified exceptions, *see* 28 U.S.C. § 1332(d)(3), (d)(4), (d)(5), (d)(9), with respect to: (1) a class action, including a putative class action; (2) that is commenced on or after February 18, 2005; (3) in which claims are asserted on behalf of one hundred or more class members; (4) at least one class member is a citizen of a state different from at least one defendant or, alternatively, at

least one class member is a foreign state or a citizen or subject of a foreign state and at least one defendant is a citizen of a state (and vice versa), and; (5) the class claims exceed in the aggregate $5 million, exclusive of interest and costs. *See* 28 U.S.C. § 1332(d)(1)(B), (d)(1)(D), (d)(2), (d)(5)(B), (d)(6), (d)(7), (d)(8); *Brill v. Countrywide Home Loans, Inc.,* 427 F.3d 446, 447 (7th Cir.2005); *Baker v. Acer Am. Corp.,* Civil No. 09–885–GPM, 2009 WL 3681865, at *1 (S.D.Ill. Nov. 3, 2009); *Schillinger v. 360Networks USA, Inc.,* Civil No. 06–138–GPM, 2006 WL 1388876, at *2 (S.D.Ill. May 18, 2006), *quoting* Pub. L. 109–2, § 9, 119 Stat. 4.

Turning then to the matter of whether the prerequisites for the exercise of federal jurisdiction under the CAFA are satisfied in this case, the Court notes that this is a putative class action and that it was commenced, that is to say, filed, after the effective date of the statute. *See Buller Trucking Co. v. Owner Operator Indep. Driver Risk Retention Group, Inc.,* 461 F.Supp.2d 768, 772 (S.D.Ill.2006), *citing Knudsen v. Liberty Mut. Ins. Co.,* 411 F.3d 805, 806 (7th Cir.2005) ("In general a class action is commenced for purposes of removal under CAFA on the date it originally was filed in state court."). Also, according to Walsh's operative complaint in the case, the proposed class exceeds one hundred members (*See* Doc. 9–2, p. 9, ¶ 33).

■ With respect to diversity of citizenship as between the parties to this case, according to StrataCare's notice of removal, StrataCare is a corporation organized under Delaware law with its principal place of business in California; thus, StrataCare is a citizen of Delaware and California for purposes of federal diversity jurisdiction. *See Nuclear Eng'g Co. v. Scott,* 660 F.2d 241, 250 (7th Cir.1981), *citing* 28

U.S.C. § 1332(c)(1) (a corporation is, for diversity purposes, a citizen of both the state under the law of which it is incorporated and the state where it maintains its principal place of business). Unfortunately, StrataCare's notice of removal alleges Walsh's state citizenship for diversity purposes on the basis of "information and belief" (Doc. 9, p. 3, ¶ 7). In general, of course, federal jurisdiction can be invoked only by allegations made on personal knowledge, not information and belief. *See America's Best Inns, Inc. v. Best Inns of Abilene, L.P.,* 980 F.2d 1072, 1074 (7th Cir.1992); *Frakes v. B & J Food Serv. Equip. of Mo., Inc.,* Civil No. 10–247–GPM, 2010 WL 1418567, at *2 (S.D.Ill. Apr. 7, 2010).

■ Under the circumstances of this case, however, the Court does not believe it is necessary to require StrataCare to amend its notice of removal. The parties do not dispute that Walsh is an Illinois citizen. Additionally, the Court has checked Walsh's submissions to the Court against the records of corporations maintained online by the Illinois Secretary of State and accessible at http://www.ilsos.gov/corporatellc, which the Court can judicially notice. *See Holmes v. Back Doctors, Ltd.,* Civil No. 09–540–GPM, 2009 WL 3425961, at *2 n. 3 (S.D.Ill., Oct. 21, 2009) (judicially noticing online records of corporations maintained by the Illinois Secretary of State); *Bova v. U.S. Bank, N.A.,* 446 F.Supp.2d 926, 930 n. 2 (S.D.Ill.2006) (a court may judicially notice public records and government documents, including those available from reliable sources on the Internet) (collecting cases). The Illinois Secretary of State's records reflect that Walsh is a corporation organized under Illinois law. Therefore this case presents the requisite minimal diversity of citizenship for purposes of federal jurisdiction under the CAFA.[1]

1. The Court notes in passing that, according

to a recent filing by StrataCare, shortly after

Turning then to the matter of the jurisdictional amount in controversy for purposes of federal diversity jurisdiction, as StrataCare points out in its notice of removal, the fact that Walsh refuses to stipulate that its claim is worth less than $75,000 creates an inference that Walsh believes the claim is worth more than that sum. *See Oshana v. Coca-Cola Co.,* 472 F.3d 506, 512 (7th Cir.2006), *quoting Workman v. United Parcel Serv., Inc.,* 234 F.3d 998, 1000 (7th Cir.2000) ("[I]f the Walsh does not stipulate to damages of $75,000 or less, 'the inference arises that he thinks his claim may be worth more.' "). Assuming that Walsh's claim is worth $75,000 or more, then, if Walsh's claim is representative of the claims of the proposed class, the aggregate value of the claims of a proposed class of at least one hundred members more than exceeds the $5 million jurisdictional threshold under the CAFA.

■ Also, even a more conservative valuation of Walsh's claim shows that the threshold amount is satisfied. The actual loss Walsh claims is $4,383.43. It is well settled that, in appropriate cases, punitive damages can be reckoned into the jurisdictional amount for diversity purposes. "[W]here both actual and punitive damages are recoverable under a complaint each must be considered to the extent claimed in determining the jurisdictional amount." *Sharp Elecs. Corp. v. Copy Plus, Inc.,* 939 F.2d 513, 515 (7th Cir.1991), *quoting Bell v. Preferred Life Soc'y,* 320 U.S. 238, 240, 64 S.Ct. 5, 88 L.Ed. 15 (1943). "Where punitive damages are required to satisfy the jurisdictional amount in a diversity case, a two-part inquiry is necessary. The first question is whether punitive damages are recoverable as a matter of state law." *Cadek v. Great Lakes Dragaway, Inc.,* 58 F.3d 1209, 1211–12 (7th Cir.1995). "If the answer is yes, the court has subject matter jurisdiction unless it is clear 'beyond a legal certainty that the plaintiff would under no circumstances be entitled to recover the jurisdictional amount.' " *Id.* at 1212, *quoting Risse v. Woodard,* 491 F.2d 1170, 1173 (7th Cir.1974).

■ Walsh asserts a claim under the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815

this case was removed StrataCare converted itself from a corporation to a limited liability company ("LLC"). A case can be removed if federal jurisdiction exists when the case is filed and when it is removed. *See Kanzelberger v. Kanzelberger,* 782 F.2d 774, 776–77 (7th Cir.1986); *Baker v. Johnson & Johnson,* 709 F.Supp.2d 677, 691 (S.D.Ill.2010). Also, events that occur after a case has been removed do not affect the existence of federal jurisdiction. *See Cunningham Charter Corp. v. Learjet, Inc.,* 592 F.3d 805, 807 (7th Cir. 2010), *citing St. Paul Mercury Indem. Co. v. Red Cab Co.,* 303 U.S. 283, 293–95, 58 S.Ct. 586, 82 L.Ed. 845 (1938); *Morrison v. YTB Int'l, Inc.,* Civil Nos. 08–565–GPM, 08–579–GPM, 2010 WL 1558712, at *10 n. 8 (S.D.Ill. Apr. 19, 2010). However, the Court notes, even were it the case that StrataCare's conversion to an LLC has some bearing on the existence of federal jurisdiction in this case, according to StrataCare's recent corporate

disclosure statement, StrataCare's sole member is an LLC of which the sole member is a corporation organized under Delaware law (*See* Doc. 27, p. 2, ¶ 5). Accordingly, StrataCare is a Delaware citizen. *See Thomas v. Guardsmark, LLC,* 487 F.3d 531, 534 (7th Cir.2007) (as an unincorporated association, an LLC has the state citizenship of its members for purposes of federal diversity jurisdiction); *Cosgrove v. Bartolotta,* 150 F.3d 729, 731 (7th Cir.1998) (same). *See also Mutual Assignment & Indemnification Co. v. Lind-Waldock & Co., LLC,* 364 F.3d 858, 861 (7th Cir.2004) (noting that the citizenship of an LLC for diversity purposes "may need to be traced through multiple levels if any of [the LLC's] members is itself a partnership or LLC"). Because, as discussed, Walsh is a corporation organized under Illinois law, there is minimal diversity of citizenship between Walsh and StrataCare, notwithstanding the latter's conversion to an LLC.

ILCS 505/1 *et seq.*, alleging "willful and wanton" conduct and "intentional" misrepresentation by StrataCare (Doc. 9–2, p. 19, ¶ 78). If true, punitive damages may be available on Walsh's ICFA claim. *See Smith v. Prime Cable of Chicago*, 276 Ill. App.3d 843, 213 Ill.Dec. 304, 658 N.E.2d 1325, 1336 (1995) (in ICFA cases, "[p]unitive damages, while disfavored, ... are recoverable where the alleged misconduct is outrageous either because the acts are done with malice or an evil motive or because they are performed with a reckless indifference toward the rights of others.") (citations omitted). Assuming that Walsh can recover punitive damages on its ICFA claim in a ratio of approximately three times Walsh's actual damages, and further assuming that Walsh's damages are representative of the proposed class as a whole, a class of only 417 members ($12,-000 multiplied by 417) would satisfy the jurisdictional minimum amount for purposes of federal diversity jurisdiction under the CAFA. *See Anthony v. Security Pac. Fin. Servs., Inc.*, 75 F.3d 311, 317–18 (7th Cir.1996) (suggesting that, when reckoning punitive damages into the jurisdictional amount for diversity purposes, an appropriate ratio of punitive damages to actual damages is 3:1). *Cf. Smith v. American Gen. Life & Accident Ins. Co.*, 337 F.3d 888, 895–96 (7th Cir.2003) (holding that the jurisdictional amount in controversy was not satisfied by a hypothetical award of punitive damages in a ratio to actual damages of 29:1).

In light of the foregoing, the Court concludes that it has jurisdiction in this case pursuant to both 28 U.S.C. § 1331, by virtue of Walsh's RICO claim, and 28 U.S.C. § 1332, as amended by the CAFA.

### C. *Background*

At issue in this action is an alleged scheme known as a "silent PPO," a term of art for a specific kind of Preferred Provider Organization (PPO) abuse.[2] A PPO is a managed care technique encompassing numerous contracts between health care providers (such as Walsh), payors (such as insurance carriers and employer), various third parties, and the PPO network administrator. The PPO at issue here is administered by First Health Group Corporation ("First Health"), who is not a party to this suit.

The first specific contract at issue here is the Provider Agreement that Walsh entered into with First Health on March 13, 2002 (Doc. 9–2, Ex. A). Under this contract, Walsh agreed to participate in the First Health PPO, and provide services to "participating patients"—as defined by the contract—at discounted rates. The second contract at issue is between StrataCare and First Health. It is entitled, "Workers' Compensation Managed Care Serves Network Agreement" ("Network Access Agreement"), and it was signed on January 1, 2005 (Doc. 20, Ex. 1). According to StrataCare, this contract gave its "software licensees access to the First Health PPO Network" (Doc. 20, p. 1). Walsh alleges that these two contracts are incorporated by reference into one agreement, the terms of which StrataCare breached by allegedly failing "to steer patients to First Health 'preferred' providers" (Doc. 9–2, Ex. A, ¶ 45). According to Walsh, "steerage" or "channeling" of patients is mandated by the contracts, and by Illinois law, but never occurred because StrataCare failed to financially incentivize its sub-clients to use Walsh's services. In the alternative, Walsh alleges that StrataCare lacked a valid "payor agreement" and, as a result, acted fraudulently when it claimed PPO discounts to which it was not entitled.

---

**2.** For an excellent overview of PPOs and silent PPOs see *Roche v. Travelers Property Casualty Ins. Co.*, Civ. No. 07–302–JPG, 2008 WL 2875250, *1 (S.D.Ill., July 24, 2008).

On the surface, Walsh appears to have alleged a paradigmatic silent PPO scheme; specifically, an entity, such as StrataCare, claims the discounted PPO rate for services rendered by a provider, such as Walsh, without providing any incentives to steer its clients to the PPO provider. "If the [entity] and provider are both members of the PPO, this discount payment may constitute a breach of the PPO contract[s]. If the [entity] is not a member of the PPO, but pays only the PPO rate, this discount payment may constitute fraud." *Roche v. Travelers Property Casualty Ins. Co.*, Civ. No. 07–302–JPG, 2008 WL 2875250, *1 (S.D.Ill., July 24, 2008). Walsh alleges, via alternative pleadings, that StrataCare's conduct falls within one of these two scenarios.

Here, however, there is one more contract and party involved, adding another wrench into this already convoluted scheme. In a typical silent PPO action, the defendant is a "payor" (e.g. a company) who has a valid "payor agreement" with the PPO network administrator (here, First Health); allowing it to pay discounted rates for medical services. By contrast, here, StrataCare alleges that it "is not a PPO Administrator, Third Party Administrator, Insurance Company or 'Payor'" (Doc. 20, p. 2). Instead, allegedly, "[i]t is a software company that facilitates electronic processing of transactions between the Provider, the 'Payor' and First Health, the PPO Administrator" (*Id.*). In other words, StrataCare claims it merely acts as a bill reviewer and claims processor for its "sub–clients"—companies with workers' compensation insurance plans, also known as "payors"—and First Health, the PPO network administrator. As a result, the contractual relationship between these entities, as a whole, is far from clear. Yet, after thoroughly parsing the record, enough is clear for the Court to determine which of Walsh's claims, if any, survive StrataCare's Motion to Dismiss.

### D. *Analysis*

It is a plaintiff's burden to plead sufficient factual matter to state a claim to relief that is plausible on its face. *See Ashcroft v. Iqbal,* —— U.S. ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009), *citing Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 556, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Under *Iqbal,* "a claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id., citing Twombly,* 550 U.S. at 556, 127 S.Ct. 1955. The Seventh Circuit Court of Appeals, in light of *Iqbal* and its progeny, has provided further guidance:

> First, a plaintiff must provide notice to defendants of [its] claims. Second, courts must accept a plaintiff's factual allegations as true, but some factual allegations will be so sketchy or implausible that they fail to provide sufficient notice to defendants of the plaintiff's claim. Third, ... courts should not accept as adequate abstract recitations of the elements of a cause of action or conclusory legal statements.

*Brooks v. Ross,* 578 F.3d 574, 581 (7th Cir.2009). When resolving a motion to dismiss, a court may consider any documents that are referenced in the complaint and central to the plaintiff's claims. *Venture Assoc. Corp. v. Zenith Data Sys. Corp.,* 987 F.2d 429, 431 (7th Cir.1993). Any contradictions between allegations contained in the complaint, and exhibits or other documents are resolved in favor of the latter. *Thompson v. Ill. Dept. of Prof'l Reg.,* 300 F.3d 750, 754 (7th Cir.2002) (citation omitted). Finally, " 'determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.' " *Cooney v. Rossiter,* 583

F.3d 967, 971 (7th Cir.2009), *quoting Iqbal*, 129 S.Ct. at 1950.

Walsh's claims, stated as seven separate counts, can be grouped into two broad categories: contractual claims and fraud-based statutory claims. Walsh's contractual claims can be further sub-categorized as alleging either an express contract, or a contract implied-in-fact or in law (quasi-contract). Most of Walsh's contractual claims, however, may not coexist with the fraud-based claims. As a result, pursuant to Federal Rule of Civil Procedure 8(d), Walsh has pleaded these two broad categories in the alternative.

### 1. *Breach of Contract Theories*

In its response in opposition to Strata-Care's motion, Walsh puts the proverbial cart before the horse by arguing that the First Health PPO mandates financial incentives. Indeed, Walsh dedicates almost eight pages to this argument; an argument—regarding specific terms of the alleged unified contract—that is moot if there was no valid contract between Strata-Care and Walsh in the first place.[3]

### a. *Incorporation by Reference*

Walsh argues that its Provider Agreement with First Health was incorporated by reference into StrataCare's Network Access Agreement. An identical argument in a nearly identical context previously has been rejected by this Court, and many others, on numerous occasions. *See e.g.*, *Roche v. Zenith Ins. Co.*, Civ. No. 07–875–MJR, 2009 WL 635503, *2–3 (S.D.Ill. Mar. 12, 2009); *Roche v. Liberty Mutual Managed Care, Inc.*, Civ. No. 07–331–JPG, 2008 WL 4378432, *2, 2008 LEXIS 72309, *6–7 (S.D.Ill. Sep. 23, 2008); *Roche v. Travelers Property Casualty Ins. Co.*, Civ. No. 07–302–JPG, 2008 WL 2875250, *4–5 (S.D.Ill. Jul. 24, 2008). Without citing a single precedential opinion, Walsh argues that the two agreements incorporate one another because Illinois law requires multiple agreements to establish a PPO, and here, each agreement not only references the other, but also "allocate[s] obligations and benefits flowing to each party" (Doc. 25, p. 10). The problem for Walsh is that no Court in this District, or this Circuit, has agreed that, in the PPO context, two separate agreements, executed by different parties, at different times, can be regarded as one instrument.

Under Illinois law, a contract incorporates another document only if it "show[s] an intent to incorporate the other document and make it part of the contract itself."[4] *Rosenblum v. Travelbyus.com*

---

**3.** In Walsh's extended efforts to convince this Court that entities such as StrataCare are *required* to provide financial incentives to "steer" its clients to a preferred provider, Walsh references statements in its Complaint, allegedly made by First Health (and in quotes), that lack any citation (Doc. 25, p. 3). Further, Walsh cites Illinois statutes and regulations, including the Workers' Compensation Act, taking a number of these entirely out of context, failing to demonstrate their relevance, or presenting questionable arguments of statutory interpretation. For example, one of the potentially relevant statutes expressly states "may," and Walsh argues extensively that everything following "may" is nevertheless required (Doc. 25, pp. 4–5). *See* 215 ILCS 5/370i(b). Further, the contracts at issue make no mention of financial incentives

being required, and this same argument previously has been rejected by this Court. *See, Roche v. Liberty Mut. Mngd. Care, Inc.*, 2008 WL 4378432, **4–5, 2008 U.S. Dist. LEXIS 72309 at **14–15 (S.D.Ill. Sep. 23, 2008). At bottom, Walsh's lack of citations, inaccurate citations, and painfully strained, questionable, statutory and legal arguments, detracted from its overall credibility with this Court.

**4.** Walsh briefly argues that, because the Network Access Agreement purports to invoke California law, the question of incorporation by reference should be analyzed under California law. However, the Provider Agreement is governed by Illinois law, and Walsh cites to Illinois law for a good portion of its argument for incorporation. Even if California law on incorporation by reference were to

*Ltd.,* 299 F.3d 657, 664 (7th Cir.2002), *citing Turner Constr. Co. v. Midwest Curtainwalls, Inc.,* 187 Ill.App.3d 417, 421, 135 Ill.Dec. 14, 543 N.E.2d 249 (Ill.App.Ct. 1989). When determining whether one contract is incorporated into another, a court must "limit its inquiry to the four corners of the contract." *Id., quoting Atl. Mut. Ins. Co. v. Metron Eng'g & Constr. Co.,* 83 F.3d 897, 901 (7th Cir.1996). Finally, "Illinois requires that incorporation be clear and specific." *188 LLC v. Trinity Industr., Inc.,* 300 F.3d 730, 736 (7th Cir. 2002).

■ Here, it is undisputed that Walsh and StrataCare are not parties to a single written agreement. Instead, they each entered into separate, though related, agreements with First Health—approximately three years a part. Moreover, the Network Access Agreement between Strata-Care and First Health at issue does not even purport to be a typical PPO payor agreement. Rather, it merely establishes a structure by which StrataCare finds "sub-clients" (or "payors"), and facilitates their claims with First Health PPO providers. As a result, the Network Access Agreement, on its face, expresses no intent to incorporate the Provider Agreement between Walsh and First Health.

Any intent to incorporate is further weakened by the fact that both the Provider Agreement and the Network Access Agreement contain merger clauses explicitly prohibiting the inclusion of additional terms or prior agreements into the contracts (Doc. 9–2, Ex. A, § 5.6; Doc. 20, Ex. 1, p. 11, ¶ 10.8). "[T]he presence of a merger clause is strong evidence that the parties intended the writing to be the complete and exclusive agreement between them." *L.S. Heath & Son, Inc. v. AT & T Info. Sys., Inc.,* 9 F.3d 561, 569 (7th Cir. 1993). In response, Walsh argues that the

intent to incorporate may be inferred because "[t]he Network Access Agreement refers to the *providers* at least one hundred and twenty-four times" (Doc. 25, n. 5, p. 12) (emphasis added). By conveniently omitting the word "agreement" from its assertion, Walsh makes an argument that sounds strong, in theory, but substantively fails to support incorporation by reference. Indeed, the Court can find only a few instances where the Network Access Agreement directly references the *Provider Agreement*—the inquiry relevant to the question of incorporation by reference. As a result, the merger clauses will be given their full intended effect; it is simply not plausible to infer that these agreements intended to incorporate one another.

In sum, this Court rejects Walsh's argument that the two agreements, executed three years apart, constitute a single unified contract. *See Roche v. Zenith Ins. Co.,* 2009 WL 635503, at *3. Accordingly, Walsh's breach of contract claim must be dismissed to the extent it relies upon this particular theory.

b. *Third Party Beneficiary Claim*

Next, Walsh claims that it was an intended third party beneficiary of the Network Access Agreement between Strata-Care and First Health. The parties agree that California law—as provided for in the Network Access agreement, the validity of which is uncontested—governs this portion of their dispute. Under California law, "[a] contract, made expressly for the benefit of a third person, may be enforced by him at any time before the parties thereto rescind it." Cal. Civ. Code § 1559. "The intent to benefit a third party must appear 'on the terms of the contract.' " *Landale–Cameron Court, Inc. v. Ahonen,* 155 Cal. App.4th 1401, 66 Cal.Rptr.3d 776, 782 (2007), *citing Bancomer, S.A. v. Superior*

apply, this Court cannot ascertain any sub-

stantive difference in the end result.

*Court,* 44 Cal.App.4th 1450, 52 Cal.Rptr.2d 435, 440 (1996).

 Paragraph 10.2 of the Network Access Agreement attempts to expressly disclaim any third party beneficiary status. However, "the presence of such a clause in a contract is not dispositive of whether a third party is entitled to enforce an agreement." *Zenith,* 2009 WL 635503 at *4. Instead, "[c]ourts must look to the terms of the contract as a whole, in light of the circumstances under which the parties entered into the agreement." *Id.* at *5. Ultimately, "whether a third party is an intended beneficiary of a contract is a question of fact." *Id., citing Prouty v. Gores Tech. Group,* 121 Cal.App.4th 1225, 1233, 18 Cal.Rptr.3d 178 (Cal.Ct.App. 2004).

 Walsh asserts that the Network Access Agreement "provides that the PPO 'shall be' an 'Exclusive Directed Network'" (Doc. 25, p. 13), and that this implies a direct benefit to Walsh. This language, however, is quoted sorely out of context. The full sentence reads: "Upon countersignature of an Appendix II by First Health, that particular customer will become a Sub–Client under this Agreement, and The First Health Network shall be the *Sub–Client's Exclusive Directed Network* in the geographic areas indicated on the Sub–Client's Appendix II" (Doc. 20, Ex. 1, p. 15, ¶ 2.1) (emphasis added). Appendix II is the Agreement between StrataCare, First Health and StrataCare's customer, referred to here as a "Sub-client."[5] Walsh argues that this additional contract somehow implies that the Network Access Agreement is intended to benefit Walsh. In actuality, all this additional contract demonstrates is that "The First Health Network shall be the *Sub–Client's* Exclusive Directed Network." In other words,

the Sub–Client, or "payor," must use the First Health PPO in a certain geographic area. Arguing that this language shows that the Network Access Agreement is intended to directly benefit Walsh proves too much.

Walsh further argues that the First Health PPO "expressly requires 'channeling to network providers'" (Doc. 25, p. 13), and then cites to a paragraph that doesn't exist (the Court found the cited language in Appendix II, section "C," paragraph five (Doc. 20, Ex. 1, p. 18)). Once again, Walsh attempts to use language out of context. This paragraph deals with the disclosure of confidential information, and states that the "Client," here, StrataCare, "may disclose applicable confidential information, including, but not limited to, participating provider and negotiated rate information, *to its Sub–Clients* who utilize Client's services for repricing and *channeling* to network providers" (Doc. 20, Ex. 1, p. 15, ¶ C5) (emphasis added). Once again, this language—implicating only the relationship between StrataCare and its Sub–Clients—demonstrates absolutely no intent to directly benefit Walsh.

This case is distinguishable from *Roche v. Zenith Insurance,* where this Court held that providers, such as Walsh, may be third party beneficiaries to a First Health–Payor Agreement. *Zenith,* 2009 WL 635503 at *6. First, the provisions highlighted in *Zenith,* that this Court found to be "for the benefit of preferred providers," are not a part of the Network Access agreement at issue in the case at bar. Second, here, StrataCare is not a "payor" with a typical "payor agreement" like the one at issue in *Zenith.* Instead, it is a third-party benefits administrator who, allegedly, is "not in a position to direct patients' choice of providers" (Doc. 20, p. 11).

---

**5.** In a more typical PPO scenario, this agreement would be made directly between First Health and a "payor" and thus, it would be known as a "Payor Agreement."

As a result, this case is one step removed from a PPO involving only a Provider Agreement and a typical "payor agreement."

At bottom, Walsh has not provided this Court with any terms in the Network Access Agreement demonstrating actual intent on the part of StrataCare to directly benefit Walsh. Rather, this Court finds that, in actuality, the intended beneficiary of the Network Access Agreement was StrataCare's "Sub–Client's" and First Health. Any purported benefit to Walsh was ancillary at most. In light of the foregoing, it is not plausible to infer that Walsh was directly intended to be a third party beneficiary of the Network Access Agreement. As a result, Walsh's claims predicated on this theory must be dismissed.

c. *Implied Contract Claims—In Fact and In Law (Unjust Enrichment)*

■■■ "A contract implied-in-fact is one whereby a contractual duty is imposed by reason of a promissory expression which may be inferred from the facts and circumstances and the expressions on the part of the promissor which show an intention to be bound." *Estate of Milborn*, 122 Ill.App.3d 688, 78 Ill.Dec. 241, 461 N.E.2d 1075, 1077 (1984). In order to prove an implied-in-fact contract, Walsh must have pleaded all the same elements as an express contract as well as a meeting of the minds. *Nissan, N.A., Inc. v. Jim M'Lady Oldsmobile, Inc.*, 486 F.3d 989, 996 (7th Cir.2007), citing *Brody v. Finch Univ. of Health Sci./The Chicago Med. School*, 298 Ill.App.3d 146, 232 Ill.Dec. 419, 698 N.E.2d 257, 265 (1998). However, "an implied contract cannot coexist with an express contract on the same subject." *Maness v. Santa Fe Park Enterprises, Inc.*, 298 Ill. App.3d 1014, 233 Ill.Dec. 93, 700 N.E.2d 194, 200–01 (1998) (citations omitted) (collecting cases).

■■ Here, while the issue is very close, Walsh has not pleaded sufficient facts to make its implied contract claim plausible on its face. At first glance, Walsh's own pleadings appear to be deficient. In its First Amended Complaint, Walsh alleges that, "*[u]nder the provider agreements* between Plaintiff and the Class and First Health, Defendant assumed the obligation to Plaintiff and the Class to steer patients to First Health 'preferred' providers ..." (Doc. 9–2, ¶ 58) (emphasis added). Walsh thus alleges that an implied contract arose "under the provider agreements"—an impossibility because the Provider Agreement was an express contract on the same subject. *See Maness*, 233 Ill.Dec. 93, 700 N.E.2d at 200–01. However, as this Court explained above, StrataCare was not a party to the Provider Agreement. Instead, Walsh argues that this agreement merely provides evidence of StrataCare's promise to pay for services rendered.

Walsh further argues that an implied contract between StrataCare and Walsh may be inferred because StrataCare was to include in its explanation of payments, "that reimbursement is being made pursuant to the Provider Agreement" (Doc. 20, Ex. 1, p. 18, ¶ C8). Unfortunately, Walsh takes yet another clause out of context. Here, the quoted language does not directly implicate StrataCare, but rather StrataCare's "Client." Finally, Walsh makes a generalized argument directing the Court to consider "the commercial context and [the] parties' course of dealing" (Doc. 25, p. 14). While this is not much, it is true that missing terms of implied-in-fact contracts "can be supplied by custom and usage." *See Overseas Dev. Disc Corp. v. Sangamo Const. Co., Inc.*, 840 F.2d 1319, 1326 (7th Cir.1988).

At bottom, Walsh has alleged a dearth of facts from which this Court may reasonably infer that there was an actual "meet-

ing of the minds" between Walsh and StrataCare. As a result, initially, the Court was inclined to allow Walsh to amend its pleadings with regards to its implied-in-fact contract claim. This claim, however, is barred for a separate reason. Specifically, in Count VII of its First Amended Complaint, Walsh seeks recovery under a contract implied in law/unjust enrichment theory; and, a claim of contract implied in law may not go forward "when an express contract *or a contract implied-in-fact* exists between the parties and concerns the same subject matter." *Brody*, 232 Ill.Dec. 419, 698 N.E.2d at 265 (emphasis added). In light of this, either Walsh's implied-in-fact contract claim or its unjust enrichment theory eventually must be dismissed. For reasons explained in greater detail below, the Court believes that the implied-in-fact contract claim, even if repleaded, is less plausible than Walsh's claim based on a theory of unjust enrichment. As such, Walsh's contract implied-in-fact claim will be dismissed.

■■■■ A contract implied in law, by contrast, is equitable in nature and arises "wholly apart from the usual rules relating to contracts and does not depend on an agreement or consent of the parties." *Estate of Milborn*, 78 Ill.Dec. 241, 461 N.E.2d 1075 at 1077–78. Unjust enrichment—the fundamental principle that no one should unjustly profit at another's expense—is the predicate for a contract implied in law. *See Id.* As such, a cause of action founded on a theory of unjust enrichment, "must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. Jul. 30, 2010), *citing HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill.2d 145, 137 Ill.Dec. 19, 545 N.E.2d 672, 679 (1989). "[A] claim of unjust enrichment 'is not a separate cause of action

that, standing alone, will justify an action for recovery.' " *Id., quoting Martis v. Grinnell Mut. Reinsurance Co.*, 388 Ill. App.3d 1017, 329 Ill.Dec. 82, 905 N.E.2d 920, 928 (2009). Instead, it is a theory dependent upon some "unlawful or improper conduct as defined by law, such as fraud, duress, or undue influence, and may be redressed by a cause of action based upon that improper conduct." *Alliance Acceptance Co. v. Yale Ins. Agency*, 271 Ill.App.3d 483, 208 Ill.Dec. 49, 648 N.E.2d 971, 977 (1995), *quoting Charles Hester Enters., Inc. v. Ill. Founders Ins. Co.*, 137 Ill.App.3d 84, 91 Ill.Dec. 790, 484 N.E.2d 349, 354 (1985). As a result, "[w]hen an underlying claim of fraud, duress or undue influence is deficient, a claim for unjust enrichment should also be dismissed." *Martis*, 329 Ill.Dec. 82, 905 N.E.2d at 928 (citations omitted).

■■■■ In light of the foregoing, and because all of Walsh's contract-based claims have been dismissed, the viability of Walsh's unjust enrichment theory is wholly dependent upon the sufficiency of Walsh's fraud-based claims. At this stage, however, it appears that Walsh adequately has pleaded that StrataCare, by claiming the PPO discount, potentially "retained a benefit to [Walsh's] detriment." *Siegel*, 612 F.3d at 937. However, whether this benefit was retained "unjustly," or in violation of other equitable principles, will be determined in conjunction with the adequacy of Walsh's fraud-based pleadings.

### d. *Joint Venture*

■■■■ Before turning to Walsh's fraud-based claims, the Court must deal with Walsh's last contractual claim—that StrataCare allegedly breached the Provider Agreement as "First Health's joint venturer" (Doc. 9-2, ¶ 69). "A joint venture is an association of two or more persons to carry out a single enterprise for profit."

*Yokel v. Hite,* 348 Ill.App.3d 703, 284 Ill. Dec. 155, 809 N.E.2d 721, 727 (2004). While partnership laws govern joint ventures, they are nonetheless distinct; a joint venture relates to a single transaction or enterprise whereas a partnership "encompasses a general business of a particular type." *Id.* "[I]n the absence of a formal agreement, the existence of a joint venture may be inferred from circumstances demonstrating that the parties intended to enter into a joint venture." *Id.* As a result, to establish a joint venture under Illinois law, Walsh must sufficiently allege:

> (1) an express or implied agreement to carry on some enterprise; (2) a manifestation of intent by the parties to be associated as a joint venture; (3) a joint interest as shown by the contribution of property, financial resources, effort, skill, or knowledge; (4) a degree of joint proprietorship or mutual right to the exercise of control over the enterprise; and (5) a provision for joint sharing of profits and losses.

*Autotech Tech. Ltd. P'ship v. Automationdirect.com,* 471 F.3d 745, 748 (7th Cir. 2006).

██ Clearly there was no express agreement by StrataCare and First Health to establish a joint venture because the Network Access Agreement explicitly states that: "[t]he relationship between the parties is that of independent contractors. Nothing herein is intended or will be construed to establish any agency, employment, partnership, *or joint venture relationship* between the parties" (Doc. 20, Ex. 1, p. 11, ¶ 10.1). The Court must give effect to these clear and unambiguous contractual terms. *See e.g., BKCAP, LLC v. CAPTEC Franchise Trust 2000–1,* 572 F.3d 353, 362 (7th Cir.2009). Further, it is questionable whether the intent to carry on a joint venture can be inferred from the sparse facts alleged by Walsh.

Ultimately, however, this claim must fail because Walsh has neither sufficiently pleaded a "mutual right to the exercise of control over the enterprise; [nor any] provision for joint sharing of profits and losses." *Autotech Tech.,* 471 F.3d at 748. Walsh would have this Court infer that these elements have been met based on the fact that both StrataCare and First Health agreed to "maintain in effect professional liability insurance" (Doc. 20, Ex. 1, p. 10, ¶¶ 8.1 and 8.2), and from the unknown status of the Appendix II document, "which does not disclaim any joint venture status" (Doc. 25, p. 15). These arguments, with no additional factual support from the pleadings, are insufficient to demonstrate the requisite mutual exercise of control over the enterprise, or any joint provision to share profits and losses.

As such, the existence of a joint venture relationship is implausible. First, for obvious reasons, the fact that parties to a contract are required to carry liability insurance does not mean that the parties have agreed to jointly share profits and losses related to the alleged enterprise. Second, Appendix II—the tripartite agreement between First Health, StrataCare and it's sub-client—does not contain any terms suggesting a "mutual right to the exercise of control" between StrataCare and First Health. To the contrary, many of the express terms of Appendix II reinforce the notion that First Health, as the PPO administrator, ultimately controls most (if not all) of the terms and information related to the PPO arrangement (*see e.g.,* Doc. 20, Ex. 1, p. 18, ¶ 5, "Client cannot control the use of this information beyond enforcing the terms of any confidentiality agreement between Client and such Sub-client."). Further, the terms of this agreement relate almost exclusively to the relationship between First Health and StrataCare's "Client" (a "payor" in a typical PPO), and not StrataCare itself. As

such, Appendix II lends no support to Walsh's joint venture theory. In sum, because Walsh has failed to adequately plead facts that would make a joint venture between First Health and StrataCare plausible, this claim must fail.

### 2. *Fraud–Based Theories*

#### a. *Racketeer Influenced and Corrupt Organizations Act (RICO) Claim*

 "[I]n the RICO context, allegations of fraudulent conduct must specify, with particularity, the circumstances of the alleged fraud." *Wankel v. S. Ill. Bancorp, Inc.*, Civ. No. 06–619–MJR, 2007 WL 2410328, *2 (S.D.Ill. Aug. 21, 2007), *citing Slaney v. Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 597 (7th Cir.2001); *Haroco, Inc. v. Am. Nat. Bank and Trust Co.*, 747 F.2d 384, 405 (7th Cir.1984). As a result, the "time, place, and content of the alleged false representations, the method by which the misrepresentations were communicated, and the identities of the parties to those misrepresentations," *Slaney*, 244 F.3d at 597, all must be described with specificity. *Id.* To establish a violation of RICO, Walsh must allege: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Midwest Grinding Co., Inc. v. Spitz*, 976 F.2d 1016, 1019 (7th Cir.1992).

Walsh alleges: (1) that First Health, StrataCare, and StrataCare's third-party payor clients, formed an "association in fact" (the "enterprise"); (2) that fraudulently allowed StrataCare—and other "third party payor clients," who lacked valid payor agreements with First Health—to claim First Health PPO discounts; (3) thereby defrauding Walsh from receiving full payments for medical services by issuing deceptive bills (referred to as "EORs," a term which is not defined anywhere in the Record) via mail and/or wire (Doc. 9–2, ¶¶ 80–88). As a result, on their face, Walsh's RICO claims are al-

leged with sufficient particularity to satisfy Fed.R.Civ.P. 9(b). Other than the requirement of particularity, in its Motion to Dismiss, StrataCare only challenges whether Walsh pleaded a "pattern of racketeering conduct" (Doc. 20, p. 16).

 By statute, a "pattern of activity" is two or more predicate acts committed within a ten-year period. 18 U.S.C. § 1961(5). Over the years, however, courts have further defined this nebulous concept "to prevent RICO from becoming a surrogate for garden-variety fraud actions properly brought under state law." *Midwest Grinding*, 976 F.2d at 1022 (citations omitted). As such, to show a "pattern of racketeering activity"—now, a RICO term of art—a civil RICO plaintiff no longer may merely allege two predicate acts, "but must also satisfy the so-called 'continuity plus relationship' test." *Id.* That is, "the predicate acts must be related to one another (the relationship prong) *and* pose a threat of continued criminal activity (the continuity prong)." *Id.*

Because StrataCare only challenges the latter, the Court will limit its analysis to the continuity prong. " 'Continuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 241, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). StrataCare argues that Walsh "does not plead an open-ended pattern of racketeering activity and cannot establish a close-ended pattern as a matter of law" (Doc. 20, p. 16). In response, Walsh makes a cursory argument that StrataCare's "assumption that the Complaint only pleads a 'closed-ended' pattern is not warranted ... [because it did not] plead an end-date, and discovery may also prove that [StrataCare] is still taking improper First Health Dis-

counts" (Doc. 25, p. 17, n. 6). Ironically, Walsh then spends the vast majority of this portion of its response focusing on the factors supporting a "closed-ended" pattern. Because it is unclear whether Walsh has pleaded an open or close-ended pattern of racketeering, the Court may choose to analyze either or both.

■ "An open-ended period of racketeering ... is a course of criminal activity which lacks the duration and repetition to establish continuity." *Midwest Grinding*, 976 F.2d at 1023. As a result, successfully pleading this concept hinges on the threat of repetition projected into the future. *Id.*, quoting *H.J. Inc.*, 492 U.S. at 242, 109 S.Ct. 2893. "Such a threat of continuity exists when the plaintiff can show (1) a specific threat of repetition, (2) that the predicate acts or offenses are part of an ongoing entity's regular way of doing business, or (3) that the defendant operates a long-term association that exists for criminal purposes." *Id.* (quotations omitted).

■ Here, the third factor above is in no way implicated by any of Walsh's pleadings. Further, all of Walsh's RICO allegations were pleaded in the past tense and as such, they fail to identify any "specific threat" of future repetition. However, Walsh does allege: (1) that the "Enterprise had a legitimate business purpose" administering workers' compensation claims for its third-party payor clients (Doc. 9–2, ¶ 83); (2) that StrataCare was a part of a "deceptive scheme to reprice medical claims with First Health PPO discounts which StrataCare and it's third-party payor clients had no right to take" (*Id.* at ¶ 84); and (3) that StrataCare routinely and repeatedly delivered deceptive bills through the U.S. mail or private carriers (*Id.* at ¶ 86). As a result, when drawing all reasonable inferences in Walsh's favor, it has adequately pled that "the predicate acts" (mail fraud) are a part of the "First Health/StrataCare PPO Enterprise's" regular way of doing business. Further, it is reasonable to assume that this "regular business conduct" may be repeated. In light of the foregoing, Walsh has shown that this alleged RICO enterprise plausibly may have engaged in an "open-ended" pattern of racketeering.[6] At this stage, that is sufficient.

**6.** Some panels of the Seventh Circuit Court of Appeals have not distinguished between closed and open-ended periods of racketeering, and focus on the same factors in either case, including: "(1) the number and variety of the predicate acts and the length of time over which they were committed; (2) the number of victims; (3) the presence of separate schemes; and (4) the occurrence of distinct injuries." *Gagan v. American Cablevision, Inc.*, 77 F.3d 951, 962–63 (7th Cir.1996) (citation omitted). However, these factors are most commonly associated with a so-called "closed scheme." *See Midwest Grinding*, 976 F.2d at 1023–24. Either way, most panels appear to agree that "[t]he most relevant and dispositive factor is the number and variety of predicate acts and the length of time over which they were committed." *Gagan*, 77 F.3d at 963. In other words, in a closed-ended pattern, "the predicate acts must extend over a substantial period of time." *Midwest Grinding*, 976 F.2d at 1024 (quotations omitted). On the basis of the pleadings and documents referenced or attached thereto, Walsh appears to be able to satisfy the "closed-ended" criteria—at least at this stage—because the predicate acts of mailing misleading bills occurred repeatedly. "[E]ach instance of false billing inflicted an injury separate and independent of the previous and succeeding instances of false billing." *Gagan*, 77 F.3d at 963, quoting *Liquid Air Corp. v. Rogers*, 834 F.2d 1297 (7th Cir.1987) (where a single scheme of fraudulent medical billing which lasted seven months and defrauded one victim established a pattern of racketeering activity). Here, Walsh has attached as exhibits two of its bills, received approximately six months a part, allegedly evincing a misleading or deceptive claim to the First Health PPO discount when none was warranted (Doc. 9–2, ¶ 86).

b. *Illinois Consumer Fraud &*
*Deceptive Business Practices*
*Act (ICFA) Claim*

■ StrataCare next argues that Walsh does not have standing to sue for violation of the ICFA "because [Walsh] is not a consumer and cannot satisfy the 'consumer nexus' test" (Doc. 20, P. 14). An ICFA plaintiff who is not a consumer may still have standing "provided the claim satisfies the 'consumer nexus' test, that is it involves trade practices addressed to the market generally or otherwise implicates consumer protection concerns." *Morrison v. YTB Int'l, Inc.*, 641 F.Supp.2d 768, 777 (S.D.Ill., 2009) (citations omitted). In determining whether Walsh sufficiently established an implication of consumer protection concerns this Court will consider whether Walsh has pleaded: (1) actions that establish a link between them and consumers; (2) how defendant's unfair or deceptive practice concerned consumers other than Walsh; and (3) "how the requested relief would serve the interest of consumers." *Brody*, 232 Ill.Dec. 419, 698 N.E.2d at 269.

Here, Walsh alleges that StrataCare's "practices were addressed to the market generally and/or otherwise implicate consumer protection concerns ... [and that StrataCare's] employment of the silent PPO scheme damages the integrity and viability of *PPO networks* and damages the *businesses of all healthcare providers* by unlawfully reducing the reimbursement of medical services below their reasonable value" (Doc. 9–2, ¶ 75) (emphasis added). Once again, this is far from a model pleading. Other than its conclusory allegation that StrataCare's practices "implicate consumer protection concerns," Walsh fails to provide any factual support for how this alleged scheme affected actual non-business *consumers*. It should have been apparent to Walsh that "PPO Networks" and "healthcare providers" are not the consum-ers at-large that may "implicate consumer protection concerns." *Brody*, 232 Ill.Dec. 419, 698 N.E.2d at 269. Rather, businesses, like Walsh, may rely upon the ICFA only if the alleged conduct affects actual consumers and their protection concerns; thereby satisfying the requisite "consumer nexus." *Id.*

■ Nevertheless, in its Response to StrataCare's motion, Walsh argues that, "StrataCare's quiet, yet fraudulent scheme to reduce payments to medical service providers exposes medical consumers—their patients—to increased costs of medical treatment" (Doc. 25, p. 18). Normally, a Complaint may not be amended via briefs submitted along with dispositive motions. *See e.g., Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir.1996) ("A plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment."). Here, however, the Court would have drawn the same conclusion as a reasonable inference from the sparse facts alleged; namely, that patients of medical providers (i.e. actual consumers at large) may be affected by StrataCare's alleged fraudulent claims of PPO discounts, via fee increases needed to cover their providers decreased income. *See e.g., Roche v. Country Mut. Ins. Co.*, Civ. No. 07–367–GPM, 2007 WL 2003092, *5, n. 7 (S.D.Ill.2007) ("Presumably, falsely holding oneself out as offering consumers health insurance on a PPO basis without in fact furnishing the benefits normally associated with a PPO, such as reduced co-payments and deductibles would satisfy the consumer nexus requirement."). As a result, an adequate "consumer nexus" reasonably may be inferred; and, once again, by the slimmest of margins, Walsh has sufficiently pleaded that it has standing under the ICFA.

■ Normally, resolving the issue of standing alone would not end the Court's

inquiry under the ICFA. Here, however, StrataCare did not make any argument that Walsh failed to adequately allege the specific elements of an ICFA claim.[7] Indeed, from the face of the operative Complaint, the Court is satisfied that each element has been sufficiently alleged.[8] Walsh has adequately pleaded that StrataCare's actions were the proximate cause of the actual damages (i.e. not receiving full fees) it suffered. In light of the foregoing, Walsh's claim that StrataCare violated the ICFA may go forward.

Because Walsh has pleaded sufficient facts to make its ICFA claim plausible on its face it follows that Walsh also may proceed with its unjust enrichment theory. There are a variety of theories that could support an unjust enrichment claim under Illinois law. *See e.g., HPI Health Care Servs. v. Mt. Vernon Hosp.*, 131 Ill.2d 145, 137 Ill.Dec. 19, 545 N.E.2d 672, 678–79 (1989). Here, Walsh's theory of unjust enrichment is based on StrataCare's conduct which it deemed fraudulent, unfair or deceptive under the ICFA. Such conduct, if indeed it transpired, would violate "fundamental principles of justice, equity, and good conscience." *HPI Health Care Servs.*, 137 Ill.Dec. 19, 545 N.E.2d at 679. In other words, it would be "unjust." As a result, because StrataCare may have engaged in an unfair practice, Walsh's unjust

enrichment claim remains viable. *See Siegel*, 612 F.3d at 937.

### E. *Conclusion*

For the reasons outlined above, the Court hereby **GRANTS IN PART AND DENIES IN PART** Defendant Strata-Care, Inc.'s Motion to Dismiss (Doc. 19). The motion is **GRANTED** to the extent that the Court dismisses Counts I through IV. The motion is **DENIED** in all other respects and as such, this action may proceed on Plaintiff Walsh Chiropractic, LTD's claims under RICO, the ICFA and, those based on a theory of unjust enrichment (Counts V through VII).

IT IS SO ORDERED.

---

**7.** The elements of a successful claim under ICFA are: "(1) a deceptive or unfair act or practice by the defendant; (2) the defendant's intent that the plaintiff rely on the deceptive or unfair practice; and (3) the unfair or deceptive practice occurred during a course of conduct involving trade or commerce." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 934 (7th Cir.2010). Walsh also must show that it suffered actual damages from StrataCare's conduct. *See Sound of Music Co. v. Minn. Mining & Mfg. Co.*, 477 F.3d 910, 923 (7th Cir. 2007).

**8.** This Court has noted on other occasions, in the context of an alleged silent PPO scheme, that taking PPO discounts in the absence of a valid agreement with the PPO network could properly state a claim for consumer fraud. *Roche v. Liberty Mut. Mngd. Care, Inc.*, Civ. No. 07–331–JPG, 2008 WL 4378432, *4, n. 4, 2008 U.S. Dist. LEXIS 72309, *13, n. 4 (S.D.Ill.2007), *citing Roche v. Country Mut. Ins. Co.*, Civ. No. 07–367–GPM, 2007 WL 2003092, *5 (S.D.Ill.2007) (falsely representing a right to take PPO discounts without offering [PPO] plans under applicable insurance policies could "form the basis for a claim of statutory fraud").